**Gordon ZERBETZ, Trustee for RSB Investment Fund II, Ltd., a Limited Partnership, Appellant/Cross–Appellee.**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee/Cross–Appellant.**

**S–4937.**

Supreme Court of Alaska.

July 23, 1993.

Paul J. Nangle, Lawrence A. Pederson, Paul J. Nangle & Associates, Anchorage, for appellant/cross-appellee.

Ann Waller Resch, Deputy Mun. Atty., Anchorage, for appellee/cross-appellant.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

RSB Investment Fund II, Ltd. ("RSB") alleges inverse condemnation of its property by the Municipality of Anchorage ("Municipality"). The questions presented are whether the Municipality's designation of RSB's property as "conservation wetlands" constituted a regulatory taking, and whether the Municipality's construction of the North Klatt Road Extension resulted in a physical invasion of RSB's property. The superior court granted the Municipality's partial summary judgment motion[1] on the regulatory takings question, holding that the "conservation wetlands" designation did not amount to an inverse condemnation of RSB's property. A jury determined that no physical taking occurred as a result of the construction of the North Klatt Road Extension. We affirm both the superior court's grant of partial summary judgment and the jury's verdict.

## I. FACTS AND PROCEEDINGS BELOW

A. *Facts relevant to the regulatory takings issue.*

In May 1978 RSB purchased a 39.02 acre tract of real property in the Klatt Bog area of South Anchorage for $250,000. The

---

1. The Municipality moved for partial summary judgment twice; after RSB filed its complaint, and after RSB filed its amended complaint. Both times the Municipality requested that the superior court dismiss RSB's regulatory takings

property was, and still is, zoned R–1A.[2]

In 1979 the Municipality adopted the Anchorage Coastal Management Plan or "ACMP." The ACMP states in part:

One of ACMP's primary goals is complementing and strengthening local and areawide planning and management capabilities, in coordination with State and Federal agency and private sector activities. In so doing, ACMP is intended to furnish coastal area citizens with improved opportunities to constructively influence the land and water management decisions which affect their lives. District coastal management programs are not designed to impose additional impediments to various uses of coastal lands and waters, but rather to more equitably and efficiently apply the diverse array of existing Federal, State and local authorities governing such uses, and to ensure the balanced consideration of a broad range of competing interests.

In 1982 the Municipality implemented the Anchorage Wetlands Management Plan, which classifies property in the Anchorage Bowl as either "Preservation," "Conservation," "Developable," or "Special Study." The Plan designated RSB's property as "Conservation/Development," which means that development could "selectively proceed on portions of this wetland following presentation of data and review of these data by the Municipal Platting Board." The data required included "representative soil borings," "hydrologic information specifying the quality, amount and direction of flow of surface and subsurface water," "vegetative information," and "habitat information."[3] AMC 21.15.-030(C)(3)(a-d).

In 1985 the Municipality adopted the Anchorage Park, Greenbelt and Recreational Facility Plan. This Plan provides in part:

In South Anchorage, a linear park should be set aside around Klatt Bog. The linear park should include a trail for recreational purposes and buffer space to protect habitat within the bog.

*Recommendations: Campbell Lake, Bayshore, Klatt and Oceanview areas*

A Klatt Bog greenbelt system should be set aside to provide open space and trails in the new Southport–Klatt area development.

There is no evidence in the record that these proposals were ever adopted.[4]

---

claim, and both times the superior court complied.

2. Property zoned R–1A is restricted to single family residences.

3. Once these data are submitted, the platting authority or the Planning and Zoning Commission must make certain findings before approving a plat application. AMC 21.05.115(B)(4) reads in part:

In order to maximize protection of wetlands designated "conservation," in addition to the criteria normally considered in subdivision and conditional use applications, the platting authority or the Planning and Zoning Commission must, prior to approval [of any development proposal], make explicit findings that:
  a. the proposed design and placement of roadways, utility lines and structures will not interfere with the natural drainage function indicated in the required hydrologic studies or that such interference can be adequately mitigated to maintain the natural drainage function;
  b. the soils in the area proposed for development will adequately support roadways and structures, or that properly designed roads and foundations will be provided;
  c. habitat areas identified in the required habitat studies will be adequately protected. Maintenance of open space in its natural state shall be required where the platting authority or the Planning and Zoning Commission determines that such is necessary to protect the hydrologic and habitat values of wetlands on the property being developed or on adjacent property. Areas where open space is to be preserved in its natural state shall be indicated on the plat or approved site plan. The platting authority and the Planning and Zoning Commission may require such land development techniques and such additional conditions as may be appropriate to carry out the intent of the wetlands plan
  . . . .

4. RSB points to several other "studies and reports" which it says affected its capacity to develop its property. These include an early draft of the aforementioned Anchorage Wetlands Management Plan, the Municipality's Comprehensive Development Plan, an unimplemented 1985 Planning and Zoning Resolution calling for a master plan to allow for a "rational approach to development in portions of Klatt Bog while protecting and possibly enhancing the wildlife habitat value of the area," an unap-

Between August 1982 and December 1988 the Municipality received twenty-eight platting applications for properties designated "conservation wetlands" within the Campbell/Klatt Bog. The Municipal Platting Board and the Planning Commission granted development permission to twenty-six of these applications. To date, RSB has never filed an application for plat approval.

At the summary judgment stage, RSB submitted an affidavit from Robert Bannon, an Anchorage real estate broker who helped develop several of the subdivisions in the Klatt Bog. Bannon averred that "any time the Municipality or other governmental entity imposes new restrictions or additional procedures, or designates property to be included within a study relative to developability, that action will have an adverse effect on the marketability of the property." He also stated that Municipality "representatives" had told him that "no development would be permitted [on RSB's property] without extensive study and special research and engineering."

RSB also submitted an affidavit from Priscilla Post Wohl, a former senior planner with the Municipality's Community Planning Department. She stated that RSB's property was located approximately in the center of the Klatt Bog wetlands complex. She averred that "it was generally agreed by the various resource management agencies that the highest and best use for the central portion of the bog was as an open area/undeveloped wetlands areas." However, she also opined that development was still possible within the Klatt Bog if "state of the art technology is utilized to protect the resource values of the bog."

To prove that the "conservation wetlands" designation had affected the value of its property, RSB submitted the Municipality's tax assessments. The property's assessed valuation in 1985 was $1,489,500, in 1986 it was $1,089,000, in 1987 it was $591,500, in 1988 it was $202,800, and in 1989 it was $100. This precipitous drop resulted from the Municipal Assessor's policy of valuing all parcels classified as "conservation" or "preservation" wetlands at $100, regardless of the property's size or location. In his affidavit, the Municipal Assessor stated,

> It is inaccurate to conclude that the assessed value of plaintiff's property is a result of the Municipality's designation of that property as Conservation wetlands. The low valuation is a result of several factors, including the necessity of the Federal permitting process before the property can be developed and the lack of comparable wetland sales to use in evaluating the property's value.

### B. Facts relevant to the physical takings issue.

To meet the growing traffic demands of South Anchorage, the Municipality built the North Klatt Road Extension in the late 1980's. This road runs along the southerly side of Klatt Bog and connects "C" Street with the Southport Parkway. RSB's property lies to the north of this road. Because the road crosses the Klatt Bog wetlands, the Municipality was required to obtain a construction permit from the federal Army Corps of Engineers ("Corps"). The Corps saw the road "as the means to establish a permanent dike along the south side of Klatt Bog to prevent further water loss to surrounding development."

As part of its permit application, the Municipality appended a "Drainage Report" written by the project's contractor,

---

proved 1987 draft study allowing for selective development after a permit review process, and an unapproved 1989 study entitled "Southwest Anchorage Tomorrow: Growth and Development Which Works."

However, the uncontradicted statements of both the Platting Officer and the Senior Planner for the Municipality's Department of Economic Planning and Development were that these documents did not affect the Municipality's treatment of RSB's property. The Platting Officer averred that only three plans, the Anchorage Coastal Management Plan, the Anchorage Wetlands Management Plan, and the Anchorage Park, Greenbelt and Recreational Facility Plan, were used in the municipal platting process when considering whether designated conservation wetlands should be approved for subdivision.

Century Engineers and Planners, Inc. The report contains the following paragraph:

During our Corps Permit pre-application meeting in November 1985, it was the expressed concern of the Corps of Engineers and the Environmental Protection Agency representatives that the surface water that is presently finding its way into the Klatt Bog (i.e. north of the proposed alignment) would not be substantially impeded by the proposed road construction. Furthermore, it would be a desirable feature of the proposed construction if the roadway could act as a dam along the southerly side of Klatt Bog to assist in raising the water table in the bog.

The project proposal called for culverts, storm drains, and water diversions to ensure the existing drainage pattern would be disturbed as little as possible. An impermeable barrier would also be constructed along the north side of the road. The barrier would extend from just above the existing surface level to below the roadbed non-frost material. Its purpose would be to prevent a significant loss of subsurface water from the bog through the proposed road prism and to assist in raising the water level in the bog. The Municipality also proposed the construction of a "weir structure" along the north part of the road, set to impound water at a level approximately two feet below the road surface. Its purpose was also to raise the water level in Klatt Bog.

In a 1987 study entitled "Potential Impacts on the Water Table in Klatt Bog Resulting From Construction of the North Klatt Road Extension," Ott Waters Engineers Inc. reported that the impermeable barrier would only have a "minor influence" on the water table in the Bog. Similarly, it said that the culvert system "is designed to minimize any disturbance of the natural runoff patterns, and any influence is expected to be minor." As for the weir, the report concluded that:

[t]he effect of this structure depends on the relative elevations of the impounded water and the water table. It is assumed that the impoundment will be higher than the water table, in which case the groundwater will be recharged locally by the impoundment. This will raise the water table locally to an elevation near but less than the elevation of the impoundment. The effect will decrease with increasing distance from the impoundment.

In September 1987 the attorney representing the Municipality sent a letter to the Corps in which he stated:

[i]t is the understanding of the Municipality that the construction of the road as currently designed will not raise the overall Klatt Bog water table.... The [Corps] permit requirement not to lower the water table is not construed by the Municipality to be an obligation to use the project to raise water table levels in the Klatt Bog.... Such a mandate by the Corps could give rise to collateral inverse condemnation litigation against the Municipality by landowners with holdings in the Klatt Bog.... Accordingly, it is the Municipality's position at this time that the North Klatt Road Extension Project will not raise surrounding water table levels in the Klatt Bog.

At trial, Robert Bannon, who, as previously mentioned, developed several of the subdivisions in the Klatt Bog, testified that the volume of water which used to enter the Bog over a 90 day to two year period would now enter the bog within 30 minutes. He stated that a subdivision could still be built on RSB's property, but "the costs of construction exceed the anticipated costs of sales." On cross-examination he admitted that he did not know how much additional costs were required to deal with the additional water.

Francis Gallela testified as an expert in business economic development. Gallela testified that RSB's property is not marketable or financeable mainly because of the amount of water on the property. RSB also called Harry Lee, a civil engineer, who testified that in 1984 the water table was an average of nine feet below the surface; by 1991, it had risen to 2.8 feet below the surface. He attributed the increase to the North Klatt Road Extension.

The Municipality countered with the testimony of Scott Wheaton, an expert on engineering geology and hydrology. He stated that the water table was five feet, not nine feet, below the surface in 1983. He opined that the North Klatt Extension "doesn't dam up the Klatt ground water flow at all." Wheaton added that the weir structure would have no impact on the water table, except for "very locally" in the ditches just upstream from the weir itself. Wheaton stated that, based on the data he examined and the evidence he collected, he felt that the North Klatt Road Extension, the weir, the ditches and the culverts were actually "serving to dry up the system."

In a special verdict, the jury determined that no taking had occurred. RSB's request for a new trial was denied. RSB now appeals.

## II. DISCUSSION

■ RSB first argues that the superior court improperly bifurcated its claim into a regulatory takings claim and a physical takings claim. RSB urges this court to adopt its theory of a "cumulative" taking. That is, we are urged to determine whether a taking has occurred considering the "conservation" wetlands designation (and related studies and reports) in tandem with whatever adverse effects the construction of the North Klatt Extension had on RSB's property.

RSB has offered no authority for its "cumulative takings" theory. Moreover, the wetlands designation and the alleged flooding caused by the construction of the North Klatt Extension are factually unrelated and conceptually distinct. Whether the Municipality inversely condemned RSB's property by designating it as "con-

servation wetlands" can only be understood and analyzed as a regulatory taking. Conversely, excess water created by a newly constructed road is either a physical taking or it is nothing at all. In other words, whether the new road caused a water invasion is entirely unrelated to whether RSB's property was damaged by the "conservation wetlands" designation. The superior court properly divided the issues, and we will analyze RSB's claims in the same manner.

■ 1. *The regulatory takings issue.* "Private property shall not be taken or damaged for public use without just compensation." Alaska Const. Art. I, § 18. Article I, section 18 is to be liberally construed in favor of the property owner. The requirement that the condemnor pay just compensation when property is damaged provides broader protection for private property rights than the fifth amendment to the United States Constitution.

Private property is taken or damaged for constitutional purposes if the government deprives the owner of the economic advantages of ownership.

*Homeward Bound, Inc. v. Anchorage School District,* 791 P.2d 610, 614 (Alaska 1990) (citations omitted) (holding that Municipal Assembly's designation of property as potential school site did not constitute a compensable taking since such designation did not amount to a "concrete indication that [the Assembly] intend[ed] to acquire the property by condemnation."). We have defined the "economic advantages incident to ownership" of unimproved property to be "the potential for appreciation and the opportunity for development." *Id.* at 614 n. 6.[5]

5. Commentators note that the "trend of the law" in the area of wetlands protection regulations is to reject landowners' takings claims and to uphold such regulations as a lawful exercise of police power. Julius L. Sackman & Patrick J. Rohan, 2 *Nichols' The Law of Eminent Domain,* § 6.17, at 6–113 to 6–114 (1993). *See, e.g., Just v. Marinette County,* 56 Wis.2d 7, 201 N.W.2d 761, 771 (1972) (ordinance prohibiting landowner from filling wetlands without a permit was not a taking requiring just compensation; while loss of value is to be considered in determining

whether a restriction is a constructive taking, value based upon changing the character of the land at the expense of harm to public rights is not controlling); *Albano v. Township of Washington,* 194 N.J.Super. 265, 476 A.2d 852 (1984) (rezoning to protect lake from further pollution upheld as a valid exercise of police power); *Glisson v. Alachua County,* 558 So.2d 1030, 1037 (Fla.Dist.Ct.App.1990) (regulations designating 3100 acres of real estate as a "special study area" did not constitute a taking because the

■ The Municipality's designation of RSB's property as "conservation wetlands" did not deprive RSB of the "economic advantages of ownership." Property designated as "conservation wetland" under the Anchorage Coastal Management Plan can still be developed. All the Plan requires is that a developer submit water flow data, soil samples, and vegetative and habitat information. AMC 21.15.030(C)(3)(a-d). The findings the Planning and Zoning Commission must make prior to development approval of "conservation wetlands" do not place a significant burden on a landowner's opportunity to develop his property. *See* footnote 3, *supra.* Indeed, the Municipality has approved twenty-six of the twenty-eight subdivision platting applications it has received for property designated "conservation wetlands" within the Klatt Bog.

The conclusory statements of Bannon, that government regulations always affect marketability, and of Wohl, that "various resource management agencies" wanted the central Klatt Bog area to remain undeveloped, do not prove that the Municipality would reject an RSB plat application, if one should ever be tendered, merely because its property is designated "conservation wetlands." Without an application, such a conclusion would be unwarranted conjecture, considering the plat approvals for other "conservation wetlands."

■ RSB's reliance on the Municipality's tax assessments to show "diminished value" is misplaced. RSB argues that the "dramatic drop in value should have been considered by the trial court as an admission on the part of the City that all of its actions with regard to the property had dramatically decreased its value, damaged

the property." However, as RSB itself recognizes, this court has previously held that tax assessments are not admissible as proof of value in condemnation proceedings. *State v. 45,621 Sq. Feet of Land,* 475 P.2d 553, 557–58 (Alaska 1970). The rationale for such a rule, i.e. that tax assessments are "notoriously unreliable as a criterion of true value," *id.* at 557, is borne out in this case. The record reveals that it was the Municipal Assessor's practice to assess all land designated as "conservation wetlands" at $100, regardless of the property's size or location. The Assessor also averred that it would be inaccurate to conclude that the assessed value of RSB's property is a result of the Municipality's designation of that property as "conservation wetlands," citing other factors, such as the necessity of obtaining a federal permit, as the real cause of the low appraisal. Because the unrebutted evidence in the record shows that the property's assessed value bears no relationship to its fair market value, and that the Municipality's "conservation wetlands" designation did not "cause" the low assessment, RSB cannot rely on the tax assessments to argue that the "conservation wetlands" designation damaged RSB's property.[6]

Had RSB applied for a plat approval, and had that application been denied due to the property's special status, then RSB's argument would have greater weight. But, as it stands now, there is no concrete evidence that RSB was deprived of either "the potential for appreciation" or the "opportunity for development" by the "conservation wetlands" designation. *See Homeward Bound,* 791 P.2d at 614 n. 6. Thus, the superior court's granting of the Municipali-

---

regulations, which allowed owners to apply for a variance or a transfer of development, did not deny landowners all economically viable uses of their property); *see generally* Charles C. Marvel, Annotation, *Local Use Zoning of Wetlands or Flood Plain as Taking without Compensation,* 19 A.L.R. 4th 756 (1983 & Supp.1992). The rule under the United States Constitution is that "environmental" statutes, ordinances, or regulations which limit a landowner's use of his property do not accomplish a taking requiring compensation unless the owner has been deprived of all economically beneficial uses of his prop-

erty. *See Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992).

**6.** For these same reasons, we hold that the superior court did not abuse its discretion in excluding the tax assessments at trial. There is no merit to RSB's argument that the assessments should have been admitted because they would have been used not to establish set values, but as evidence of the severe damage to the property values.

ty's summary judgment motions on the regulatory takings issue are affirmed.

### 2. *The physical takings issue.*

■ After the superior court granted the Municipality's partial summary judgment motion, the case proceeded to trial on the issue of whether RSB's property suffered a physical invasion of water as a result of the Municipality's construction of the North Klatt Road Extension.[7] As noted, the jury determined that no taking had occurred. RSB's motion for a new trial was denied. RSB now asks this court to find that the jury's verdict was in error, and that the superior court erred in denying its motion for new trial. For a new trial to be appropriate, the evidence supporting the verdict must be "completely lacking or [ ] so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964); *see also Municipality of Anchorage v. Baugh Construction*, 722 P.2d 919, 927 (Alaska 1986) (a jury's findings, if supported by evidence in the record, will be upheld where "there is room for diversity of opinion among reasonable people.").

■ The jury heard conflicting testimony as to whether the water level on RSB's property had increased after the construction of the North Klatt Road Extension. RSB's expert, Harry Lee said it did, while the Municipality's expert, Scott Wheaton, said it did not. Wheaton's testimony is consistent and credible. Since there is credible evidence in the record to support the verdict, it must stand. The evidence is not so slight as to make the verdict unreasonable; therefore, we affirm the superior court's denial of RSB's motion for a new

trial.[8] As a result of our holding today, the Municipality's appeal of the superior court's denial of its motion for directed verdict is rendered moot.

**AFFIRMED.**

---

7. RSB places great emphasis on the documents in the record which indicate that the Municipality thought the North Klatt Road Extension, the weir, and the impermeable barrier would raise the water level in the bog, as if to imply that a compensable taking could arise from the mere intent to fill the bog with water. The appropriate takings focus, however, is on whether water *actually* invaded RSB's property as a result of the North Klatt Road construction. Even if intent were an issue, the record indicates that the Municipality did not intend to raise the bog's water level.

8. On RSB's remaining evidentiary issue, the superior court did not abuse its discretion by preventing the jury from seeing three RSB exhibits. These exhibits, a 1985 City Planning and Zoning Resolution, a 1985 City Planning and Zoning memo, and a 1983 Department of Interior study entitled, "Vegetation Types and Bird Use of Anchorage Wetlands," were not relevant to whether a water invasion occurred as a result of the North Klatt Road Extension.