**ALASKA RAILROAD CORPORATION**
and Damco Paving Corporation, an
Alaska Corporation, Appellants,

v.

**NATIVE VILLAGE OF EKLUTNA**, Lee
Stephan, Anna Lowrey Curtis, and Mu-
nicipality of Anchorage, Appellees.

No. S–9277.

Supreme Court of Alaska.

Feb. 15, 2002.

Rehearing Denied April 19, 2002.

William S. Cummings, Ashburn & Mason, Anchorage, for Appellant Alaska Railroad Corporation.

Sara E. Heideman, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellees Native Village of Eklutna, Lee Stephan and Anna Lowrey Curtis.

William A. Greene, Deputy Municipal Attorney, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee Municipality of Anchorage.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Damco Paving Corporation operated a commercial rock quarrying operation under a licensing agreement at the Alaska Railroad Corporation's quarry in Eklutna. The superior court enjoined its operations after the adjacent Native Village of Eklutna and several of its residents filed suit alleging that Damco was operating a quarry in violation of the applicable zoning ordinances of the Municipality of Anchorage. Because the superior court did not err in finding that the zoning

ordinances applied to the Damco operations, we affirm the injunction prohibiting private quarrying operations by Damco.

## II. FACTS AND PROCEEDINGS

### A. Facts

The United States government owned and operated the Eklutna quarry from an undetermined date in the late 1940's until 1985. During that period, the quarry served primarily as a riprap and ballast materials site in support of the federally owned and operated railroad. In 1985 the railroad and all of its non-real estate assets were turned over to the State of Alaska.[1] Initially the federal government retained ownership of the quarry and leased its use to the state-owned Alaska Railroad Corporation (the Railroad).[2] In 1989 the state obtained full ownership of the quarry, and the Railroad continued to own the quarry to the time of the present litigation.

The parties dispute the degree to which the Railroad has actively operated the quarry. The Railroad produced photographic and documentary evidence supporting active quarrying in some years, storage and removal of previously processed material in some years, and no information for other years. Thus, it appears that under state and federal use, the quarry was operated primarily in a multi-year cycle that consisted of a summer of quarrying multi-year quantities of rock by blasting, processing, and storing the quarried products. Then in subsequent years the quarried materials were hauled away as needed. When the stockpile became depleted, the Railroad would then engage in another summer of active quarrying.

In May 1995 the Railroad entered into an exclusive licensing agreement with Damco. Under the licensing agreement, Damco was entitled to the exclusive use of the quarry for commercial quarrying operations. In exchange, the Railroad received royalty payments for the rock quarried. Damco immediately began commercial quarrying operations. Damco's constant quarrying and rock-crushing operations exceeded the size and scope of the previous state and federal operations, which had been undertaken in a more cyclical and limited manner.

### B. Proceedings

In 1997 the tribal government of the nearby Native Village of Eklutna and several of its residents (Eklutna) filed suit to enjoin Damco's quarrying operations. Eklutna alleged that the quarry was a nonconforming use of land within the Eklutna land use district of the Municipality of Anchorage, and that neither the Railroad, as the land owner, nor Damco, as the Railroad's licensee, had sought a conditional use permit to proceed with the commercial quarrying operation. Damco raised as a defense the governmental immunity of both the state-owned railroad corporation and the federal government, the previous land owner.

In December 1997 Superior Court Judge Brian C. Shortell granted summary judgment to Eklutna. But in January 1998 Judge Shortell stayed the effect of his order pending resolution of the conflict through the municipal planning and zoning commission. When Damco failed to complete the compliance action required by the planning and zoning commission, Judge Shortell held a status hearing. The Municipality of Anchorage and the Railroad were eventually brought in as parties to the proceedings. The court entered final judgment in favor of Eklutna on May 17, 1999, requiring Damco to obtain a conditional use permit before it could continue with its quarrying operations. The Railroad and Damco then entered into an agreement settling Damco's breach of contract claim against the Railroad and joining Damco as a party to the Railroad's appeal to this court. The Railroad argues on appeal that: (1) its quarry is a de facto conditional use under Anchorage Municipal Code (AMC) 21.55.070, or alternatively, the quarry is a nonconforming use under AMC 21.55.030; (2) AMC 21.55.090, which requires that the Railroad abide by an approved development and restoration plan and that the planning and zoning commission set a rea-

---

1. See Alaska Railroad Transfer Act, 45 U.S.C. §§ 1201–14 (1987).

2. AS 42.40.010.

sonable time period for discontinuation of the quarry operation, does not apply to the Railroad; (3) the federal government's supremacy immunity protects Damco's use of the quarry; (4) the superior court's interpretation of the AMC worked an unconstitutional taking; and (5) the superior court's injunction was too broad.

## III. *STANDARDS OF REVIEW*

■ We apply our independent judgment "[w]here the interpretation of a zoning ordinance presents only a question of statutory construction which does not involve agency expertise or the formulation of fundamental policies."[3]

3. *Balough v. Fairbanks North Star Borough*, 995 P.2d 245, 254 (Alaska 2000).

4. *See id.*

5. *See North Kenai Peninsula Road Maint. Serv. Area v. Kenai Peninsula Borough*, 850 P.2d 636, 639 (Alaska 1993).

6. The relevant sections of the current Anchorage zoning ordinance follow.

**21.55.010 Intent.**
Within the zoning districts established by this title or amendments that may later be adopted, there may exist lots, structures, uses of land and structures, and characteristics of use which were lawful before the effective date of the applicable regulations, but which would be prohibited, regulated or restricted under the terms of chapters 21.35 through 21.50 or future amendments. It is the intent of this chapter to permit these nonconformities to continue until they are removed, but not to encourage their perpetuation. It is further the intent of this chapter that nonconformities shall not be enlarged upon, expanded or extended, or be used as grounds for adding other structures or uses prohibited elsewhere in the same district. . . . .

**21.55.030 Nonconforming uses of land.**
Where, at the time of the original passage of applicable regulations, lawful use of land existed which would not be permitted by the regulations thereafter imposed by chapters 21.35 through 21.50, and where such use involves no individual structure other than small or minor accessory buildings, the use may be continued so long as it remains otherwise lawful, provided:
A. No such nonconforming use shall be enlarged or increased or extended to occupy a greater area of land than was occupied at the effective date of adoption or amendment of the relevant regulations.

■ The superior court's grant of summary judgment is reviewed *de novo* and will be affirmed if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law.[4]

■ We review an order granting a temporary injunction under the abuse of discretion standard.[5]

## IV. *DISCUSSION*

The outcome of this case turns on the interpretation of the currently applicable Anchorage zoning ordinance.[6] We explain in

B. No such nonconforming use shall be moved in whole or in part to any portion of the lot or parcel other than that occupied by such use at the effective date of adoption or amendment of the relevant regulations.
C. If any such nonconforming use of land ceases for any reason for a period of more than one year, any subsequent use of land shall conform to the regulations specified by this title for the district in which such land is located.
D. No additional structure not conforming to the requirements of this title shall be erected in connection with such nonconforming use of land.

**21.55.070 Uses permitted under conditional use provisions.**
A use existing before the original effective date of applicable regulations that is permitted as a conditional use in the district in which it is located under the terms of this title shall not be deemed a nonconforming use. Such use shall be considered to exist as a conditional use. The scope of the conditional use shall be governed by the provisions of this chapter unless modified by the planning and zoning commission in accordance with section 21.15.030. . . .

**21.55.090 Mineral resource operations.**
Notwithstanding the provisions of section 21.55.070, where exploitation of mineral resources exists as a nonconforming use and has been in continuous existence since April 21, 1969, or before, that use may continue provided the owner thereof complies with the following:
A. On or before March 31, 1978, the owner shall obtain approval by the municipal planning and zoning commission of, and agree to abide by, a development and restoration plan for the property. . . .
B. A narrative statement shall also be submitted with the development and restoration plan. . . .
C. In connection with consideration of the owner's proposed development and restoration

the margin the genealogy of the current ordinance sections because previous versions and legislative history help us to interpret the current ordinance.[7]

### A. The Quarry Is Not a De Facto Conditional Use Under the Anchorage Municipal Code.

The Railroad's primary argument on appeal is that under AMC 21.55.070 the quarry is a *de facto* conditional use of the land rather than a nonconforming use that would require application for a conditional use permit to operate. A "nonconforming use" is a preexisting use of land that is prohibited, regulated, or restricted under the current zoning applicable to the area in which it is situated.[8] A "conditional use," also referred to as a "special exception," [9] is a use that is generally inappropriate for the area in which it is situated but that is permitted after additional controls and safeguards are instituted "to ensure [its] compatibility with permitted principal uses." [10] By arguing that the quarry is a *de facto* conditional use, the Railroad hopes to avoid the conditional use permit application process and the planning and zoning commission's imposition of controls and safeguards to ensure the quarry's compatibility with permitted uses.

The Railroad's argument that the quarry is a *de facto* conditional use under section .070 is premised on two necessary bases. First, section .070 must be the controlling section of the municipal zoning code. Second, section .070 must be interpreted to provide for *de facto* conditional uses. For the reasons discussed below, we independently reject both bases of the Railroad's argument.

### 1. AMC 21.55.090 regulates mineral resource operations to the exclusion of other zoning provisions.

### a. Section .090 controls mineral resource operations because it specifically addresses the issue while other provisions deal generally with nonconforming uses.

The Railroad argues that under either AMC 21.55.030 or AMC 21.55.070 it is permitted to allow Damco to operate a nonconforming quarrying operation without submitting an operations and amortization plan, as required by AMC 21.55.090. We reject these contentions because section .090 specifically addresses the topic of mineral resource operations while sections .030 and .070 do not.

Chapter 21.55 addresses nonconforming uses and contains all three sections at issue. Section .030 generally allows existing nonconforming uses to continue, or "grandfathers"

---

plan, the commission shall set a reasonable period of time for discontinuation of the mineral resource operation....

....

H. This chapter shall not apply to any mineral resource operation continuing as a lawful conditional use on August 9, 1977.

I. This chapter shall not be construed to prohibit or restrict owners of nonconforming mineral resource operations from raising constitutional or legal objections to decisions of the planning and zoning commission relating to restoration plans, amortization or conditions of separation.

7. The current AMC 21.55.090 was derived with only minor changes and renumbering from the Greater Anchorage Area Borough Code (GAABC) 21.05.070(I), which the assembly enacted on August 9, 1977. Its predecessor is the original 1969 Zoning Ordinance of the Greater Anchorage Area Borough 21–7(I). All versions require mineral resource operations that exist as nonconforming uses to file an amortization plan. The 1977 amendment added substantially to the orig-

inal in an effort to specify both the rights of the mineral resource operation owners and the powers of the planning and zoning commission.

The current AMC 21.55.070 was derived from GAABC 21.05.070(G), which in turn was derived from the original 1969 Zoning Ordinance of the Greater Anchorage Area Borough 21–7(G). GAABC 21.05.070(G) and 21–7(G) both allowed preexisting uses that were permitted as special exceptions to continue as conforming uses. The current version AMC 21.55.070 allows a preexisting use that is permitted as a conditional use to continue as a conditional use.

8. *See* AMC 21.55.010 (1999); 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 6.01, at 481–82 (4th ed.1996).

9. *See* AMC 21.35.020 ("A special exception is a conditional use, and wherever the terms appear in this title they may be used interchangeably.").

10. AMC 21.35.020 (defining "special exception"); *see* 2 Kenneth H. Young, *Anderson's*

the uses, without specifying any particular type of nonconforming use:

> Where, at the time of the original passage of applicable regulations, lawful use of land existed which would not be permitted by the regulations thereafter imposed by chapters 21.35 through 21.50, and where such use involves no individual structure other than small or minor accessory buildings, the use may be continued so long as it remains otherwise lawful.... [11]

In similarly general terms, section .070 "grandfathers" existing conditional uses without specifying any particular type of conditional use:

> A use existing before the original effective date of applicable regulations that is permitted as a conditional use in the district in which it is located under the terms of this title shall not be deemed a nonconforming use. Such use shall be considered to exist as a conditional use.[12]

By contrast, section .090 specifically concerns nonconforming uses that exploit mineral resources:

> Notwithstanding the provisions of section 21.55.070, *where exploitation of mineral resources exists as a nonconforming use* and has been in continuous existence since April 21, 1969, or before, that use may continue.... [13]

■ It is significant that section .090 opens with the language, "[n]otwithstanding the provisions of section 21.55.070." This phrase literally means, "despite 21.55.070." To read the zoning code as suggested by the Railroad, we would have to read out the "notwithstanding" language of section .090. But this violates the principal "that every word of a statute has a purpose and is not superfluous." [14] To avoid superfluity, we in-

terpret section .090 literally. It must therefore operate to the exclusion of section .070.

■ Even without the "notwithstanding" language, section .090 specifically addresses the topic of mineral resource operations, whereas sections .030 and .070 do not. We have previously noted that "[i]t is a maxim of construction that specific statutes should be given precedence over more general ones." [15] When interpreting potentially conflicting provisions of the zoning code, a more specific provision controls over conflicting provisions that address the same topic in a more general manner.[16] Accordingly, we conclude that section .090 controls the zoning of mineral resource operations in the Municipality of Anchorage to the exclusion of sections .030 and .070.

> b. *The legislative history indicates that the Anchorage Borough Assembly intended AMC 21.55.090 to be the exclusive provision addressing "grandfathered" mineral exploitation operations.*

The legislative history of the 1977 revision of what is now section .090 also indicates that it covers the "grandfathering" of all rights to mineral resource extraction operations.

Anchorage adopted its first comprehensive zoning ordinance in 1969.[17] The ordinance regulated, among other things, the extraction of minerals.[18] A number of property owners, however, had commenced the operation of gravel pits on their properties before the implementation of the zoning code.[19] The extent of these "grandfather" rights to continue operating were somewhat in doubt.[20]

In 1975 the superior court in Anchorage decided *Greater Anchorage Area Borough v.*

---

*American Law of Zoning* § 9.20, at 167–73 (4th ed. 1996).

**11.** AMC 21.55.030.

**12.** AMC 21.55.070.

**13.** AMC 21.55.090 (emphasis added).

**14.** *City of Cordova v. State, Dep't of Health and Soc. Servs., Medicaid Rate Comm'n,* 789 P.2d 346, 353 (Alaska 1990).

**15.** *Id.* at 352.

**16.** *See id.*

**17.** *See* George M. Sullivan, *"Grandfather" Gravel Pit Ordinance, AO No. 77–224,* Assembly Memorandum 593–77, at 1 (July 17, 1977).

**18.** *See id.*

**19.** *See id.*

**20.** *See id.*

*Alaska Aggregate Corporation (Alagco )*.[21] In *Alagco*, Superior Court Judge James K. Singleton addressed the original 1969 zoning code.[22] Alagco had two controversial operations on its property.[23] One use at issue was a concrete batch plant, for which Alagco had received a special exception permit from the planning commission in 1964.[24] The other use was a "grandfathered" nonconforming gravel pit operation.[25]

Judge Singleton held that Alagco's right to operate the concrete batch plant expired on July 2, 1974 according to the terms of its special exception permit.[26] The court further held that Alagco's right to continue its nonconforming gravel mining terminated one year after the predecessor to AMC 21.55.090, Greater Anchorage Area Borough Code (GAABC) § 21–7(I),[27] was effective because Alagco had not submitted the required operations and amortization plan.[28] Judge Singleton explained that "[u]nless established as a non-conforming use or permitted as a special exception, Ordinance No. 1–69 prohibits any use of the subject premises for mineral exploitation."[29] That is, unless the use was "grandfathered" as an established operation for which an operations and amortization plan had been submitted, or unless the operation had already applied for and received a conditional use permit, the zoning ordinance prohibited the operation. Judge Singleton rejected Alagco's argument that GAABC § 21–7(G) (the predecessor to section .070[30]) created a *de facto* conditional use in light of the explicit treatment of mineral resource operations[31] in GAABC § 21–7(I) (the predecessor to section .090[32]).

In the wake of the *Alagco* ruling, the Anchorage Assembly reconsidered the issue of "grandfathered" mineral extraction operations.[33] Members of the mayor's administration met with industry representatives and worked out a compromise solution to the status of the law after *Alagco*.[34] In essence, the compromise was to reopen the filing period for owners to submit an operations and amortization plan.[35]

Since the resulting zoning scheme effectively adopted the result reached by the su-

**21.** No. 74–4496 Ci. (Alaska Super., 3d Dist., Anchorage, June 16, 1975).

**22.** *See id.* at 1–5.

**23.** *See id.*

**24.** *See id.* at 2–5.

**25.** *See id.* at 3, 5.

**26.** *See id.* at 16.

**27.** GAABC § 21–7(I) provided:
Where exploitation of mineral resources exists as a nonconforming use, the following regulations shall govern:
(1) Time limitations on Mineral Resource Operations. Within one year from the effective date of this ordinance, either such use shall cease or the owners thereof shall prepare for submission to the Planning Commission, a plan for development and re-use of the operation site in conformity with the provisions of Sec. 21–6(M)(5), which plan will result in phasing out the operation within a specified period of time. The plan for re-use shall indicate a proposal for re-use of the property in accordance with the regulations of this ordinance for the district in which the property is located.
Such plans, with other necessary documents, shall be presented to the Planning Commission at least 90 days before expiration of the one year period. If not so presented, or if not approved by the Planning Commission as a Special Exception, continued operation after the expiration of the one year period shall be a violation of this ordinance.

**28.** *See Alagco*, No. 74–4496 at 15–16.

**29.** *Id.* at 16.

**30.** *Compare* GAABC § 21–7(G) *with* AMC 21.55.070. GAABC § 21–7(G) provided:
A use existing before the effective date of this ordinance which is permitted as a Special Exception in a district under the terms of this ordinance shall not be deemed a nonconforming use in such district, but shall without further action be considered a conforming use.

**31.** *See Alagco*, No. 74–4496 at 15–16.

**32.** *Compare* GAABC § 21–7(I) *with* AMC 21.55.090.

**33.** *See* George M. Sullivan, *"Grandfather" Gravel Pit Ordinance, AO No. 77–224*, Assembly Memorandum 593–77, at 1–3 (July 17, 1977).

**34.** *See id.* at 1–2.

**35.** *See id.* at 2–3; *compare* Anchorage Ordinance (AO) 77–251 (Nov. 22, 1977) *and* AO 77–224 (Aug. 9, 1977) *with* GAABC § 21–7(I).

perior court in *Alagco* with a compromise to reopen the operations and amortization plan-filing period, the legislative history supports our interpretation that AMC 21.55.090 applies to all mineral resource operations to the exclusion of section .070.

### 2. *AMC 21.55.070 does not provide for de facto conditional uses for mineral resource operations.*

The Railroad argues that AMC 21.55.070 provides for automatic *de facto* conditional use status for preexisting uses of land, including the quarry in this case. The Railroad particularly relies on the first two sentences, which provide:

> A use existing before the original effective date of applicable regulations that is permitted as a conditional use in the district in which it is located under the terms of this title shall not be deemed a nonconforming use. Such use shall be considered to exist as a conditional use.[36]

The Railroad argues that these sentences apply to the quarry and grant it conditional use status without further action.

This argument fails because the third sentence of section .070 modifies the first two: "The scope of the conditional use shall be governed by the provisions of this chapter."[37] This sentence points in this case to AMC 21.55.090, the section addressing nonconforming continuing uses of mineral resource operations. Thus, even if section .070 applies in this case, it still requires compliance with the other provisions of chapter 55, including the filing of an operations and amortization plan under section .090.

### B. *The Exception of AMC 21.55.090(H) Does Not Apply.*

■ The Railroad next argues that paragraph (H) of section .090, which states that

"[t]his chapter shall not apply to any mineral resource operation continuing as a lawful conditional use on August 9, 1977,"[38] provides an exception applicable to this case. Although it is superficially plausible, we reject this argument.

### 1. *The quarry is a mineral resource operation.*

For paragraph (H) to apply, the quarry must first be a mineral resource operation.[39] The AMC defines a mineral resource operation as "commercial or industrial operations involving removal of ... peat, muck, topsoil, fill, sand, gravel or rock, or any mineral and other operations having similar characteristics."[40] The quarrying, storage, sale, and removal of rock is obviously a mineral resource operation.

### 2. *The quarry was not a lawful conditional use on August 9, 1977.*

The quarry must also have been a lawful conditional use in 1977 for the exception of paragraph (H) to apply. Although the Railroad concedes that the federal government did not comply with the predecessor to section .090[41] when it owned the quarry in 1969 and 1977, it nonetheless argues that the quarry was a lawful conditional use because municipal zoning regulations do not apply to the federal government.

### a. *The federal government was not required to comply with the municipal zoning ordinance.*

The Railroad contends correctly that the municipality could not enforce its zoning regulations against the federal government. When it owned and operated the quarry, the federal government was immune from zoning regulation by virtue of the supremacy clause of the federal Constitution.[42] Eklutna con-

---

**36.** AMC 21.55.070.

**37.** AMC 21.55.070.

**38.** AMC 21.55.090(H).

**39.** Although this is a simple question with an obvious result, it has relevance to the Alaska Railroad's later argument that the superior court's injunction is too broad.

**40.** AMC 21.35.020.

**41.** Former GAABC § 21–7(I), later renumbered 21.05.070(I) in 1969 and AMC 21.55.090 in 1977–78.

**42.** *See Hancock v. Train,* 426 U.S. 167, 178, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Blackburn v. United States,* 100 F.3d 1426, 1435 (9th Cir. 1996).

cedes this point. But the Railroad confuses the federal government's supremacy immunity from municipal enforcement of a zoning regulation with a lawful conditional use attained by compliance with regulatory requirements.

> b. *The government's supremacy immunity did not transform the generally prohibited quarry usage into a lawful conditional use.*

As support for its argument that the quarry was a lawful conditional use in 1977, the Railroad contends that the original zoning ordinance "did not apply to the United States," and that, "by its own terms [section .090] applied only to uses subject to Municipal regulations in 1977." We disagree because the quarry has existed as a prohibited land use that was exempt from enforcement by supremacy immunity, not as a lawful conditional use.

In 1969 the Greater Anchorage Area Borough first classified the Eklutna area in its zoning scheme. At that time, Eklutna was in an "unrestricted" or "U area." Mineral resource extraction in "U areas" was permitted only as a special exception and therefore a conforming use under GAABC 21.05.070(G) and 21.05.050(S)(4)(d).[43] To qualify as a special exception, a mineral resource operation had to apply to the planning commission and submit an operations and amortization plan.

As no such plan was ever submitted to the planning commission, the quarry never qualified as a special exception and did not automatically become a lawful conforming use under GAABC 21.05.070(G). Thus, after the ordinance became effective, the quarry was a nonconforming use that had to either cease operations within a year or file an operations and amortization plan.[44] Since the federal government owned the quarry, it neither filed an operations and amortization plan nor ceased its quarrying activities. Instead, the quarry existed as a prohibited use under the municipal code that was immune from municipal enforcement under the federal government's supremacy immunity. That condition continued when the municipal code was amended in 1977. At that time, the present version of AMC 21.55.090 went into effect. Again the zoning ordinance required documentation of a plan of operations, including an amortization plan. Again, the federal government, shielded by supremacy immunity, neither filed an operations and amortization plan nor ceased its quarrying activities.

The quarry in 1977 was therefore a prohibited use that was able to operate only because of the federal government's supremacy immunity. When the Railroad obtained ownership of the quarry in 1989, it could do nothing to make the quarry a lawful conditional use as of August 9, 1977. Thus, the Railroad has not satisfied the requirement of

---

**43.** GAABC 21.05.070(G) provided:
Uses Under Special Exception Provisions Not Nonconforming Uses. A use existing before the effective date of this ordinance which is permitted as a Special Exception in a district under the terms of this ordinance shall not be deemed a nonconforming use in such district, but shall without further action be considered a conforming use.
GAABC 21.05.050(S)(4) provided, in relevant part:
Subject to the requirements of the special exception procedures of this ordinance, the following uses may be permitted:
. . . .
d. Natural resource extraction, subject to the provisions of Section 21.05.060(M)(5).
GAABC 21.05.060(M)(5) provided, in relevant part:
Natural Resource Extraction:
a. A site plan, drawn to scale, shall be submitted with any application for a Special Exception.
. . . .

b. A narrative statement shall also be submitted with the application for a Special Exception.
. . . .

**44.** GAABC 21.05.070(I) provided, in relevant part:
Where exploitation of mineral resources exists as a nonconforming use, the following shall govern:
(1) Time limitations on Mineral Resources Operations. Within one year from the effective date of this ordinance, either such use shall cease or the owners thereof shall prepare for submission to the Planning Commission, a plan for development and re-use of the operation site in conformity with the provisions of Sec. 21.05.060(M)(5), which plan will result in phasing out the operation within a specified period. The re-use plan shall indicate a proposal for re-use of the property in accordance with the regulations of this article for the district in which the property is located.

paragraph (H)—a lawful conditional use—and the quarry remains subject to section .090.[45]

### C. *A Government's Supremacy Immunity from Zoning Does Not Transfer to a Private Party that Leases or Licenses the Use of the Land.*

■ The Alaska Railroad argues that it "succeeded to the United States' rights in the land, and was free to transfer these rights to DAMCO," as the basis for the argument that the "grandfather" rights originating with the federal government are alienable through the Alaska Railroad to Damco. This argument implies that the Railroad's supremacy immunity is a transferable property right. We disagree.

■ As the Maine Supreme Court held in affirming a zoning board's exemption of a privately run salmon hatchery because of the state's involvement and supervision of the project, "state ownership alone is not enough to preclude the application of local zoning regulations. There must be some showing that the use of the state's land is in furtherance of a state purpose or governmental function." [46] Similarly, a New York court has held that a private party leasing land from the federally operated Conrail is subject to municipal building permit regulations.[47]

Accordingly, we reject the argument that Damco was able to operate under the Railroad's supremacy immunity.

### D. *Public Land Is Not Subject to Constitutional Takings Protections.*

■ The Alaska Railroad also claims, presumably on behalf of Damco, that the quarry is subject to constitutional takings protections. This argument is frivolous because the takings provisions of both the United States and Alaska constitutions protect only *private* property from takings.[48] Since the land at issue here is owned by the Alaska Railroad Corporation, a state agency, there is no takings issue.

■ If instead the Railroad's argument is that the taking refers to Damco's property interest in its license to operate the quarry, it still fails. First, Damco has no vested property interest in the "grandfather" rights to operate the quarry. If they belong to any party, the "grandfather" rights belong to the Railroad. Second, Damco and the Railroad made no attempt to comply with the zoning regulations and obtain conditional use status for the quarry. Mere regulation of a land use does not constitute a taking.[49]

### E. *The Superior Court's Injunction Was Not Too Broad.*

■ The Railroad's final argument is that even if the superior court was correct in entering summary judgment for Eklutna and enjoining Damco's quarrying activities, the injunction was too broad. The crux of the Railroad's complaint is that the injunction bars the sale, storage, and removal of previously blasted and processed rock that is currently stored at the quarry.

---

**45.** Section .090 requires that the owner of a nonconforming use of mineral resource exploitation gain planning and zoning commission approval of a development and restoration plan by March 31, 1978. Since no landowner has complied with this requirement of section .090, the possibility that the quarry can continue to operate as a nonconforming use is now foreclosed. However, we note that if a lessee or licensee of the Railroad would like to quarry rock at the Eklutna quarry in the future, that party may apply for a conditional use permit under AMC 21.50.070, which has similar regulatory requirements to those of section .090. *Compare* AMC 21.55.090 *with* AMC 21.50.070.

**46.** *Senders v. Town of Columbia Falls,* 647 A.2d 93, 95 (Me.1994) (citing *Campbell v. City Council of Lynn,* 32 Mass.App.Ct. 152, 586 N.E.2d 1009

(1992); *People v. New York Racing Ass'n, Inc.,* 116 Misc.2d 587, 457 N.Y.S.2d 668 (N.Y.App. 1982)).

**47.** *See People v. Saltzman,* 126 Misc.2d 686, 483 N.Y.S.2d 560, 561–62 (N.Y.Crim.1984).

**48.** U.S. Const. amend. V; Alaska Const. art. I, § 18.

**49.** *See Zerbetz v. Municipality of Anchorage,* 856 P.2d 777, 782 n. 5 (Alaska 1993) ("The rule under the United States Constitution is that 'environmental' statutes, ordinances, or regulations which limit a landowner's use of his property do not accomplish a taking requiring compensation unless the owner has been deprived of all economically beneficial uses of his property.").

The court's order enjoining the sale, storage, and removal of commercial quantities of quarried rock is not too broad because these activities are within the definition of a mineral resource operation for which either nonconforming use status or a conditional use permit is required.[50] Moreover, Damco appears to have quarried and processed much of the rock in question during the long pendency of this case when Damco knew its activities were possibly in violation of municipal zoning ordinances. Plus, Damco still has the potential remedy of applying for a conditional use permit to allow it to sell the stockpiled rock. Accordingly, we hold that the superior court did not abuse its discretion by enjoining Damco's sale, storage, and removal of the rock.

## V. CONCLUSION

Because the superior court properly concluded that Damco's operation of the Eklutna quarry required a conditional use permit, and because Damco did not have such a permit, we AFFIRM the entry of summary judgment and the order enjoining Damco's commercial quarrying activities.

MATTHEWS, Chief Justice, with whom BRYNER, Justice, joins, dissenting.

MATTHEWS, Chief Justice, with whom BRYNER, Justice, joins, dissenting.

Does AMC 21.55.090, which applies only to nonconforming uses, apply to the railroad quarry? The majority answers "yes," concluding that the quarry was a nonconforming use when that section became effective. My answer is "no" because under GAABC 21.05.070(G) land uses existing when zoning was first imposed which are permissible as special exceptions in the use district where the land is located become, without further

action, conforming uses. The quarry meets these qualifications because it preexisted zoning, lies in a U-use district, and quarries are permitted as special exceptions in U districts.

The central question in this case is whether the railroad quarry existed as a nonconforming use as of the institution of zoning in 1969. The answer is not to be found in GAABC 21.05.070(I).[1] That subsection tells us the actions that mineral operations that are nonconforming uses must take to stay in business, but it does not tell us which mineral operations are nonconforming uses. The latter subject was addressed in GAABC 21.05.070(G). I set out this subsection at this point, along with GAABC 21.05.070(I), so that the reader can readily view both subsections in context:

GAABC 21.05.070(G) provided:

Uses Under Special Exception [2] Provisions Not Nonconforming Uses. A use existing before the effective date of this ordinance which is permitted as a Special Exception in a district under the terms of this ordinance shall not be deemed a nonconforming use in such district, but shall *without further action* be considered a conforming use. (Emphasis added.)

GAABC 21.05.070(I) provided in relevant part:

Mineral Resources Operations. Where exploitation of mineral resources exists as a nonconforming use, the following regulations shall govern:

(1) Time limitations on Mineral Resource Operations. Within one year from the effective date of this ordinance, either such use shall cease or the owners thereof shall prepare for submission to the Planning Commission, a plan for development and re-use of the operation site in conform-

---

50. *See* AMC 21.35.020 and 21.40.240.

1. Actually as originally enacted in 1969 the section in question was GAABC 21–7(I), but this was soon recodified without change as GAABC 21.05.070(I). *See* note 27 of the majority opinion. I will use the recodified numbering system to avoid confusion because it is used by the majority opinion.

2. In 1977 the term "Special Exception" as used in the zoning ordinance was changed to the term

"Conditional Use." The terms are synonymous, for the definition of "Special Exception" became the definition of "Conditional Use." Both terms are defined as: "A provision which allows for flexibility within the zoning ordinance by permitting certain specified uses in zoning districts where such uses are generally considered appropriate, but only after additional controls and safeguards are applied to insure their compatibility with permitted principal uses."

ity with the provisions of Sec. 21.05.060(M)(5), which plan will result in phasing·out the operation within a specified period.

Subsection .070(G) applied to the railroad quarry. The quarry was located in a U district when the ordinance went into effect. Mineral resource operations were permitted in U districts as a special exception.[3] Since quarries were permitted as a special exception in a U district, they were not "deemed a nonconforming use in such district."[4] Instead, "without further action," under the express terms of subsection .070(G) they were to "be considered a conforming use."[5]

The majority opinion disagrees with the conclusion that the railroad quarry became a conforming use at the advent of zoning under subsection .070(G). Op. at 596. It acknowledges that in U districts mineral resource operations were permitted as a special exception. Op. at 596. But it states that "[t]o qualify as a special exception, a mineral resource operation had to apply to the planning commission and submit an operations and amortization plan."[6] Op. at 596. Because no application was submitted in the case of the railroad quarry, the majority concludes that "the quarry never qualified as a special

exception and did not automatically become a lawful conforming use under GAABC 21.05.070(G)." Op. at 596. The majority thus reasons that an owner using property before the effective date of the ordinance which is permitted as a special exception in the district in which the land is placed must apply for a special exception in order to "automatically" obtain conforming use status. This, it seems to me, conflicts with subsection .070(G). That subsection states in clear terms that the preexisting use becomes a conforming use "without further action" when zoning is imposed.

Perhaps the majority has concluded *sub silentio* that natural resource extraction is a special type of special exception that is not covered by subsection .070(G). But such a conclusion would lack textual support. Subsection .070(G) speaks of special exceptions without differentiation, plainly implying that all special exceptions are meant to be included. Under that subsection only special exceptions for uses that did not preexist zoning must be applied for.[7] Applications for those special exception uses must contain specified information setting out the details of the proposed use.[8]

---

**3.** GAABC 21.05.050(S)(4)(d).

**4.** GAABC 21.05.070(G).

**5.** *Id.* By contrast, if at the advent of zoning the quarry had been located, for example, in an R–1 district where mineral resource operations were flatly prohibited—that is, not permitted even by special exception—then the quarry would have become a nonconforming use. As such, the operation of the quarry would have been governed by GAABC 21.05.070(I) as well as 21.05.070(A) and (C). The operation in the *Alagco* case, discussed by the majority on pages 593–594, was in an R-l zone and thus was a nonconforming use. *See Greater Anchorage Area Borough v. Alaska Aggregate Corp.*, No. 74–4496 Ci. (Alaska Super., 3d Dist., Anchorage, June 16, 1975) at 2–3.

**6.** The amortization plan is evidently a reference to one of the requirements of an application for a natural resource extraction special exception. The application must contain a narrative statement setting forth the "[e]stimated length of time necessary to complete the operation." GAABC 21.05.060(M)(5)(b)(iv).

**7.** GAABC 21.05.080(G).

**8.** *See, e.g.,* GAABC 21.05.060(M)(1)(b) requiring site plans for hospitals, nursing and rest homes

and similar institutions and GAABC 21.05.060(M)(6)(c) requiring site plans for storage yards. All of the special exception uses for a U district are subject to various conditions and procedures under GAABC 21.05.050(S)(4):

> Subject to the requirements of the special exception procedures of this ordinance, the following uses may be permitted:
> a. Mobile home parks, subject to the provisions of Section 21.05 .060(M)(11).
> b. Junkyards, automobile wrecking yards and salvage yards; subject to the provisions of Section 13.25.100 (Junkyards) of this code.
> c. Noxious, injurious or hazardous uses, as defined in Section 21.05.060(S)(5); provided, however, that the Planning Commission may grant a special exception for such uses when it finds that the public health, safety, welfare and convenience will be adequately protected by location, topography, fencing, buffering or by observation of protective performance standards that effectively remove the proposed use from classification as a nuisance.
> d. Natural resource extraction, subject to the provisions of Section 21.05.060(M)(5).
> e. Uses concerned with alcoholic beverage sales and dispensing allowed as special exceptions pursuant to Section 21.05.060(N).

To say, as the majority does, that preexisting uses that are permissible as special exceptions must have been applied for in order to qualify for "automatic" conforming use status is a contradiction in terms. Such a conclusion renders meaningless the provision in subsection .070(G) that such a use "shall without further action be considered a conforming use."

Therefore, subsection .070(G) should be interpreted to mean what it says. Land uses in existence when zoning is first imposed which are permitted as special exceptions in the use district in which the land is located are not nonconforming uses. Instead, without further action they are considered conforming uses. The railroad quarry thus became a conforming use under subsection .070(G) when zoning was imposed in Eklutna. In turn, the quarry did not "exist[ ] as a nonconforming use" under subsection .070(I) and therefore the requirements of subsection .070(I) did not apply to it. The amendments of August 9, 1977, contained in AMC 21.55.090, also do not apply to the quarry because section .090 only applies to mineral operations that exist "as a nonconforming use."

In summary, the railroad quarry existed as a conforming use rather than a nonconforming use. Since section .090 does not apply to the railroad quarry, the theory relied on by the majority is erroneous. As this was also the theory on which summary judgment was granted by the superior court, the judgment should be reversed and this case should be remanded for further proceedings.