ALASKA CENTER FOR the ENVI-
RONMENT, and Alaska Wild-
life Alliance, Appellants,

v.

Frank RUE, Commissioner, Alaska
Department of Fish and Game,
and State of Alaska, Appellees.

No. S–10887.

Supreme Court of Alaska.

July 30, 2004.

Valerie L. Brown and Robert W. Randall, Trustees for Alaska, Anchorage, for Appellants.

Jon K. Goltz, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

The Alaska Center for the Environment and the Alaska Wildlife Alliance (collectively, "the center") filed a superior court action challenging a decision by the Commissioner of Fish and Game declining to list the Cook Inlet beluga whale as endangered under the Alaska Endangered Species Act. The commissioner found that Cook Inlet belugas failed to qualify for endangered species list-

ing because they are not currently threatened with extinction, and also because they are not a distinct subspecies within the meaning of the act. The superior court upheld the commissioner's finding that no danger of extinction existed and affirmed his decision on that basis, without resolving the subspecies issue. The center appeals, challenging the commissioner's findings on both the endangerment and subspecies issues. We affirm the finding on lack of endangerment. Because the commissioner's ruling on that point precludes an endangered species listing, we affirm his decision. To provide future guidance, however, we further conclude that the commissioner used an incorrect legal standard—and thus failed to consider relevant information—in deciding that Cook Inlet belugas are not a distinct subspecies.

## II. FACTS AND PROCEEDINGS

Beluga whales (*Delphinapterus leucas*) range throughout arctic and subarctic waters in North America, Greenland, Europe, and Asia. They are social animals, living in herds of up to 1,000 individuals. Adult males generally group in separate pods from females, calves, and juveniles. The whales often swim four to six abreast while rolling in tandem to breathe. Adult belugas range from eleven to fifteen feet in length and weigh from 1,000 to 2,000 pounds, with females being smaller than males. Belugas are robust, with a small dorsal fin, bulging, melon-shaped head and small beak, and they are the only whale with the ability to bend their necks.

Approximately 100,000 beluga whales inhabit the waters of Alaska, comprising five separate populations. The Cook Inlet beluga whale is genetically the most distinct of Alaska's beluga populations, and it is reproductively isolated. It is also the smallest beluga population. In the mid–1980s, the Cook Inlet beluga population was estimated at approximately 1,000 to 1,300. Since then, the population has experienced a steady decline. Between 1994 and 1998, their numbers decreased nearly fifty percent, from 653 to 357.

Throughout this period of decline, Cook Inlet belugas were harvested by Alaska Native subsistence hunters. In May 2000, re-

sponding to a request by the Alaska Department of Fish and Game, the National Marine Fisheries Service designated Cook Inlet belugas as a depleted stock after determining that their current numbers fell below the optimum sustainable population level. Based on this finding, the fisheries service began to draft regulations to limit the harvest of these belugas.[1] Various groups petitioned the fisheries service to list Cook Inlet belugas as an endangered species under the Federal Endangered Species Act. After exhaustive review, however, the fisheries service determined in June 2000 that the Cook Inlet belugas' decline had primarily resulted from overharvesting, a problem that its new regulations would be able to address. Finding no likely danger of extinction in the foreseeable future, the service declined to list Cook Inlet belugas as an endangered species under the federal act.

Meanwhile, the center, together with other groups, petitioned Alaska's Commissioner of Fish and Game, asking that Cook Inlet beluga whales be listed as an endangered species under the Alaska Endangered Species Act. Upon consulting with various experts, reviewing numerous comments, and considering other available information, the commissioner issued a decision letter in July 2000, declining to list Cook Inlet belugas as endangered under the Alaska Endangered Species Act. The commissioner based this determination on two alternative theories: "Cook Inlet beluga whales are not threatened with extinction, and so are not endangered within the meaning of Alaska's ESA. Also, Cook Inlet beluga whales do not constitute a 'species or subspecies' within the meaning of this law."

The center filed a superior court action for declaratory and injunctive relief, claiming that the commissioner erred in finding that Cook Inlet belugas are not threatened with extinction and that they do not constitute a species or subspecies under the Alaska Endangered Species Act. After the parties filed cross-motions for summary judgment, the superior court entered an order upholding the commissioner's finding on the issue of threatened extinction. Reviewing this finding under the deferential standard established in *Southeast Alaska Conservation Council, Inc. v. State*,[2] the superior court concluded that the commissioner had taken a hard look at the salient issues and had made a rational decision. But as to the commissioner's alternative finding that Cook Inlet belugas are not a species or subspecies, the court's original order remanded for further proceedings, ruling that this finding had not been adequately explained. The court revised its ruling on reconsideration, however, evidently agreeing with the state's position that the subspecies issue did not need to be decided because it was moot. Ultimately, then, the superior court simply affirmed the commissioner's decision.

The center appeals.

## III. DISCUSSION

### A. Standard of Review

■■■ We review the superior court's decision on summary judgment de novo.[3] In reviewing an agency's regulatory decision, such as the commissioner's refusal to list Cook Inlet belugas as an endangered species, we usually apply the "reasonable but not arbitrary" standard,[4] which "consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[5] But when the decision raises a question of statutory interpretation involving legislative intent rather than agency expertise, we review that question independently, applying the substitution-of-judgment standard.[6]

---

1. The Marine Mammal Protection Act gives the National Marine Fisheries Service exclusive authority to manage the harvest of beluga whales.

2. 665 P.2d 544, 549 (Alaska 1983).

3. *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

4. *Handley v. State*, 838 P.2d 1231, 1233 (Alaska 1992).

5. *Interior Alaska Airboat Ass'n v. State*, 18 P.3d 686, 690 (Alaska 2001).

6. *Jerrel v. Dep't of Natural Res.*, 999 P.2d 138, 141 (Alaska 2000).

## B. Statutory Background

The legislature adopted Alaska's Endangered Species Act in 1971.[7] The act's opening section contains a strong statement of purpose: "The legislature recognizes that, due to growth and development, certain species or subspecies of fish and wildlife are now and may in the future be threatened with extinction. The purpose of [this act] is to establish a program for their continued conservation, protection, restoration, and propagation."[8] Alaska's act is similar but not identical to the Federal Endangered Species Act.[9] The Alaska act authorizes the Commissioner of Fish and Game to determine that a species or subspecies of fish or wildlife is endangered by finding "that its numbers have decreased to such an extent as to indicate that its continued existence is threatened."[10] Under the act, the commissioner must make this finding by seeking "the advice and recommendation of interested persons and organizations, including but not limited to ornithologists, ichthyologists, ecologists, and zoologists" and considering four potential indicators of threatened extinction:

(1) the destruction, drastic modification, or severe curtailment of its habitat; (2) its overutilization for commercial or sporting purposes; (3) the effect on it of disease or predation; (4) other natural or man-made factors affecting its continued existence.[11]

Upon determining that a species or subspecies qualifies under these criteria, the commissioner places it on a published list of endangered species.[12] The commissioner may add to the list on a continuing basis and must review the entire list at least once every two years.[13] Once listed as endangered, a species or subspecies "may not be harvested, captured, or propagated except under the terms of a special permit issued by the commissioner";[14] violations of these restrictions are punishable as misdemeanors.[15]

## C. Commissioner's Findings on Threat of Extinction

■ The center initially challenges the commissioner's finding that Cook Inlet beluga whales are not currently threatened with extinction and thus do not need to be listed. In the center's view, the commissioner's decision is arbitrary and lacks a rational basis because it fails to consider the small size of the Cook Inlet beluga population and assesses only past causes of decline rather than current threats to survival.

We find little merit to these claims. In reaching his decision, the commissioner reviewed a broad array of data and information, including the National Marine Fisheries Service's then-recent decision not to add Cook Inlet belugas to the federal endangered species list. Based on the entirety of this information, the commissioner analyzed the four statutory factors specified under Alaska's act.[16]

Considering the first factor, threats to habitat,[17] the commissioner found that "[t]here is no scientific evidence to tie the decline of the Cook Inlet population of beluga whales to the destruction, drastic modification, or severe curtailment of habitat," and that "current policies provide protection for beluga whale habitat in Cook Inlet."

As to the second factor, overutilization,[18] the commissioner noted strong historical evidence suggesting that Cook Inlet belugas had been overharvested, finding that "[c]learly the harvest in recent years has caused a significant decline in the population." Since

---

7. Ch. 115, § 1, SLA 1971. The act is codified in the Alaska Statutes as Article 3 of Title 16—AS 16.20.180–.210.

8. AS 16.20.180.

9. 16 U.S.C. §§ 1531–1599 (2000).

10. AS 16.20.190(a).

11. AS 16.20.190(a), (c).

12. AS 16.20.190(b).

13. Id.

14. AS 16.20.195.

15. AS 16.20.200.

16. AS 16.20.190(a)(1)-(4).

17. AS 16.20.190(a)(1).

18. Id. at (2).

federal law gives the National Marine Fisheries Service exclusive power to regulate the harvest of whales, the commissioner noted, "[o]nly the federal government can change this." And in fact, the commissioner observed, the federal government had recently enacted laws and had begun to draft rules to control the overharvest. While believing it likely that these measures would succeed in controlling the overharvest, the commissioner emphasized that he intended to monitor the issue and would "reconsider this determination in the event that [the fisheries service] fails to adopt long-term regulations controlling hunting at sustainable levels."

Addressing the third factor, disease and predation,[19] the commissioner found no scientific evidence of any appreciable or increased threat attributable to this category.

Concerning the fourth, catchall, factor,[20] the commissioner reviewed available information on recent beluga-whale strandings, incidental takings in commercial fisheries, environmental conditions affecting the availability of food, potential contamination through chemical pollution, and destruction of existing physical habitat. Finding "no evidence [that] any of these other factors have had, or are having, any impact on the health or mortality of Cook Inlet beluga whales," the commissioner concluded that "Cook Inlet beluga whales are not threatened with extinction."

The center advances a two-pronged attack on these findings. First, it assails the commissioner for failing to recognize that the depleted size of the Cook Inlet beluga population is "the one factor that poses the biggest threat" to the whales' survival. Relying on an analysis prepared by the Alaska Chapter of the Wildlife Society, which concludes that the Cook Inlet beluga's population is "so reduced that it is likely to decline toward extinction in the event of harvest of a single individual" per year, the center asserts that the commissioner "simply deferred" to a contrary view expressed by the fisheries service, which found that the population could sustain an annual harvest of up to seven whales a year. Because of this oversight, the center

insists, the commissioner lacked any rational basis to find that the population's depleted size did not, by itself, establish a threat of extinction.

But this argument, at its core, simply asks us to reweigh the information in the agency record and substitute our judgment for the commissioner's. The commissioner's decision shows that he was aware of and considered the beluga stock's depleted size: as the center recognizes, the commissioner specifically addressed this issue, observing, "Just because the population is small is no indication that it is not healthy and viable." While the commissioner's observation certainly indicates that his views on this point concur with the fisheries services' assessment rather than the Wildlife Society's, this hardly demonstrates that the commissioner "simply deferred" to the former and arbitrarily rejected the latter. On the whole, the commissioner's analysis of statutory and other factors bearing on the issue of threatened extinction reflects an overarching concern with the population's dwindling size and the manner of its depletion. Our function is not to reweigh the competing information on this issue; instead, the law requires us to accept the commissioner's decision unless it lacks any rational basis. Here, the commissioner considered the requisite factors, and the fisheries services' recent findings provided a rational basis to conclude that the belugas' diminished population did not by itself imperil the whales' survival. We thus find no occasion to second-guess this decision.

The center separately asserts that the commissioner misapplied the statutory factors. The center posits that the commissioner "assessed threats to the Cook Inlet beluga whale solely on the basis of whether there was conclusive evidence linking that threat to the past decline of the population." This was error, the center insists, because "[t]he requisite inquiry under Alaska's [act] is fundamentally a forward-looking one, asking whether there are any threats to the species or subspecies that may affect its future survival, i.e., its 'continued existence.' "

---

**19.** *Id.* at (3).

**20.** *Id.* at (4).

But experience teaches: our past is often the most reliable predictor of our future. Indeed, it seems difficult to imagine many threats of extinction that could be reliably predicted without experiential analysis. A fair reading of the challenged decision indicates that the commissioner sought to obtain a reliable view of current and potential future danger by taking a hard look at the historical information at hand. Despite roundly criticizing this retrospective approach, the center identifies no purely prospective risk overlooked by this examination of historical harm.[21]

In summary, then, our review of the record convinces us that the commissioner's analysis of threatened extinction considered the statutory requirements, took a hard look at the salient problems, and engaged in reasoned decisionmaking. We thus uphold the commissioner's determination that Cook Inlet beluga whales did not need to be listed under Alaska's act because their numbers had not "decreased to such an extent as to indicate that [their] continued existence is threatened."[22]

### D. The "Species or Subspecies" Issue

As already mentioned, Alaska's Endangered Species Act applies only to "species or subspecies" of Alaskan fish or wildlife. Here, in addition to concluding that no current threat of extinction existed, the commissioner found that Cook Inlet beluga whales do not qualify as a " 'species or subspecies' within the meaning of this law." The center disputes this finding, arguing that the commissioner misconstrued the meaning of "species or subspecies," as used in the act.

In response, the state maintains that this issue is moot and urges us not to consider it, asserting that the commissioner's decision can be affirmed on the alternative ground that Cook Inlet belugas are not currently threatened with extinction. In any event, the state contends, the commissioner reasonably found that Cook Inlet belugas fail to qualify as a subspecies under Alaska's act because the scientific literature does not formally recognize these whales as a distinct subspecies of the general beluga species. The center replies that the commissioner's interpretation of the "species or subspecies" provision is unduly narrow and that, even if technically moot, this issue falls under the public interest exception to the mootness doctrine because it presents an important legal question that might evade review if we fail to resolve it now.

### 1. Mootness

■ The law considers a disputed claim to be moot when its resolution would not result in any actual relief, even if the claiming party prevailed.[23] Because the act would not allow Cook Inlet belugas to be listed as an endangered species unless they faced a threat of extinction, our opinion's affirmance of the commissioner's finding on this point disqualifies them regardless of their status as a species or subspecies. Accordingly, the state is correct in asserting that this issue is technically moot.

■ The mootness doctrine generally counsels against deciding moot claims; but as both parties recognize, an exception to the mootness doctrine arises when the public interest would be served by deciding an issue even though it is technically moot. In applying the public interest exception, courts must find (1) that the issue in question is capable of repetition, (2) that it might repeatedly evade review if the mootness doctrine strictly applied, and (3) that it "is so important to the public interest as to justify overriding the mootness doctrine."[24]

---

21. The center accuses the decision of failing to adequately consider threats to habitat posed by the risk of an oil spill. Yet the risk of an oil spill is one that has long existed in the Cook Inlet; and this risk has been deemed tolerable thus far. In discussing current efforts that seek to curb this risk by restricting future Cook Inlet development, the decision demonstrates the commissioner's "forward-looking" consideration of salient information concerning this risk.

22. AS 16.20.190.

23. See, e.g., DeNardo v. ABC Inc. RVs Motorhomes, 51 P.3d 919, 928 n. 50 (Alaska 2002).

24. Peninsula Mktg. Ass'n v. State, 817 P.2d 917, 920 (Alaska 1991) (quoting Hayes v. Charney, 693 P.2d 831, 834 (Alaska 1985)).

■ The state contends that the question at issue here—Cook Inlet belugas' standing as a species or subspecies under the act—fails to meet any of these requirements. But the state rests this argument on the premise that "[t]he subspecies determination is specific to the record in this case." The state reasons that "[i]f the issue arises again it will almost certainly involve different scientific evidence" because "the Commissioner's decision will depend on the record in that particular case." Yet the commissioner appears to have decided this issue primarily as a matter of law, not as a case-specific question of fact.

Despite acknowledging strong evidence of the Cook Inlet belugas' genetic uniqueness and geographic isolation, the commissioner's decision emphasized in its statement of factual background that "the fact remains that *within the meaning of Alaska's endangered species statutes,* all beluga whales in Alaskan and Canadian waters are the same species, and no subspecific designations have been proposed or accepted within the scientific community." (Emphasis added.) The commissioner's substantive analysis of the Cook Inlet beluga's classification confirmed his view that this issue presented a straightforward legal question: "There is a threshold *legal question* whether the Cook Inlet beluga whale population constitutes a 'species or subspecies' within the meaning of the Alaska ESA. Consideration of *the plain language of the statute and legislative history of the federal ESA* suggests it is not." (Emphasis added.) Later, despite finding no legislative history to indicate that the words "species" and "subspecies" were "intended to have anything other than their commonly understood definitions," the commissioner again stressed that scientific literature does not identify any population of belugas as a separate subspecies, that "Alaska law makes no provision for listing of stocks, populations or other non-specific genetic distinctions," and that, in his view, the act used "species" and "subspecies" exclusively "in the technical sense" of these words.

In the final analysis, then, the commissioner read the act as categorically limiting the definitions of "species" and "subspecies" to refer to generally accepted taxonomic classifications—an interpretation that essentially foreclosed any need to evaluate available biological information for evidence suggesting that Cook Inlet beluga whales might actually qualify as a subspecies under the commonly understood substantive meaning of the word, even though they have not yet been recognized as a subspecies "in the technical sense." So interpreted, the act left no room for case-specific discretion; as the commissioner put it, "the threshold question of whether Cook Inlet beluga whales constitute a species or subspecies within the meaning of the Alaska ESA *must be* answered in the negative." (Emphasis added.)

Because the commissioner viewed this issue as a legal question having a categorical answer, we think that his ruling meets the three-part test for review under the public interest exception to the mootness doctrine. First, the question of listing is likely to recur if the Cook Inlet beluga whale population fails to show signs of a healthy recovery; and when it does arise again, the commissioner's narrow technical view of "species or subspecies" issue will likely compel another denial of listing, except in the seemingly unlikely event that taxonomists formally recognize Cook Inlet belugas as a subspecies "in the technical sense." Second, denying review based on mootness seems likely to hamper or delay future review of this issue: even if forceful new evidence of threatened extinction arises, the commissioner's current position may well discourage new petitions and will likely prevent any realistic possibility of endangered-species listing until the subspecies issue completed a new round of appeals—a delay that seriously jeopardizes the Cook Inlet beluga population if the new petition were ultimately found to have merit. And third, as evidenced by the act's statement of purpose,[25] the question at issue has substantial importance, and its timely resolution will undoubtedly further the public interest.

### 2. Meaning of the act's "species and subspecies" requirement

■ We thus turn to the merits of "the threshold legal question" decided by the com-

**25.** *See* AS 16.20.180.

missioner: the meaning of the act's "species or subspecies" requirement.[26] Because this issue presents a question of statutory interpretation involving legislative intent, we decide it independently, applying the substitution-of-judgment standard.[27]

Initially, we note our agreement with the commissioner's comment that the legislature apparently intended to give the words "species or subspecies" their "commonly understood definitions." But the commissioner did not attempt to articulate or apply the common meaning of these words; instead, he ultimately assigned them their narrowest possible meaning, construing the act to use them in their strict "technical sense"—that is, as formal taxonomic classifications accepted in the published scientific literature.

The commissioner's reliance on this narrow definition is problematic, since it conflicts with the legislature's intent to use "species" and "subspecies" as they are commonly understood. The narrow "technical" meaning of these words may well be the one commonly applied by scientists engaged in taxonomy—a scientific discipline devoted to the systematic classification of plants and animals.[28] But we doubt that scientists working outside the specialized realm of taxonomy—particularly those engaged in actively developing areas of biological study involving fish and wildlife management—would commonly restrict these words to the narrow meanings taxonomists agree to give them in published articles. Nor does it seem realistic to assume that the Alaska Legislature chose to assign these words such a static and constricted "technical meaning" when it adopted the act. After all, the act's stated purpose is to establish a program that will effectively protect fish and wildlife against dynamic new threats of extinction—new dangers attributable "to growth and development."[29] It seems unlikely that the legislature could have

expected the act to function effectively in averting such threats if the act protected "species" or "subspecies" of fish and wildlife only after they gained formal recognition by an isolated scientific discipline that devotes itself to abstract "technical" matters of classification that are largely unrelated to fish and game management.

As cogently observed by the United States District Court in the recent case of *Center for Biological Diversity v. Lohn*, "formal taxonomic changes are often slow to occur and lag behind current knowledge"; hence, accepted taxonomic designations of whales can easily prove inaccurate, while at the same time other scientific evidence can reliably establish the existence of "species" and "subspecies" that have not yet been formally recognized by taxonomists.[30] These observations are hardly surprising. Because taxonomy organizes plants and animals to reflect their development over the ages, it naturally tends to view life in historical perspective. It thus seems illogical to expect that taxonomists would generally attach much urgency to the recognition and acceptance of new and emerging classifications. But by the same token, it seems just as illogical—and therefore probably contrary to legislative intent—to constrict the *common* definitions of "species" and "subspecies" to the technical definitions formally recognized in this single corner of science.

The superior court correctly observed in its original order on summary judgment that the dictionary can help to define the common meaning of "subspecies":

> Webster's New Universal Dictionary of the English Language (1976) defines subspecies as a "division of a species." The American Heritage Dictionary of the English [L]anguage defines "subspecies" as "a subdivision of a taxonomic species, usually based on geographical distribution."

---

**26.** AS 16.20.190(a).

**27.** *Jerrel*, 999 P.2d at 141.

**28.** Webster's, for example, defines taxonomy, in its biological sense, as "a system of arranging animals and plants into natural, related groups based on some factor common to each, as structure, embryology, or biochemistry: the basic taxa

now in use are, in descending order from most inclusive, *kingdom, phylum . . ., class, order, family, genus,* and *species*." WEBSTER'S NEW WORLD COLLEGE DICTIONARY at 1467–68 (4th ed.2004).

**29.** AS 16.20.180.

**30.** *Ctr. for Biological Diversity v. Lohn*, 296 F.Supp.2d 1223, 1233 (W.D.Wash.2003).

The Academic Press Dictionary of Science and Technology defines "subspecies" as a "taxonomic rank immediately below species indicating a group of organisms that is geographically isolated from and may display some morphological differences from other populations of a species, but is nevertheless able to interbreed with other such groups within the species where their ranges overlap." It appears that the "common definition of subspecies" includes looking at distinct geographical segments.

These common definitions point to a useful core of features commonly associated with a subspecies: geographic isolation; distinctive characteristics, often genetically determined; and a retained ability to interbreed with other members of the same general species. While this description lacks precision in many respects and hardly qualifies as an exhaustive definition, the issues presented here do not require a more exacting elaboration. The most important point for present purposes is that the commonly understood meaning of "subspecies" does not turn on the categorical pronouncements of a single science; nor does it describe a classification in the rigid "technical sense" of general agreement or acceptance as reflected by scientific literature.[31] To the contrary, while the narrow meanings of these words are certainly included in their commonly understood meanings, their common meanings are broader and more flexible. As used in the act, they call for a case-specific exercise of discretion by the commissioner based on a hard look at all currently available scientific information, including but not limited to formally recognized taxonomic classification.

In short, nothing in the common definitions of these words requires the commissioner to determine the existence of a subspecies by exclusive reference to the generally accepted views of a single branch of science; as with the issue of

threatened extinction, the act requires the commissioner to determine the existence of a subspecies by taking a hard look at the available views of informed scientists from all relevant disciplines. When this information leaves serious doubt as to the de facto status of an unrecognized subspecies, the commissioner has broad discretion to fall back on traditionally accepted taxonomic classifications; but when up-to-date, case-specific science reliably indicates that taxonomic changes have lagged behind and are no longer accurate, the act gives the commissioner broad discretion to find that a protectable subspecies exists under the act, regardless of whether the classification finds general support in the "technical sense."

The crucial point, again, is that the act vests controlling discretion in the commissioner, not in taxonomy. Here, as our review of the disputed decision makes clear, the commissioner largely failed to recognize or exercise his full range of discretion. By concluding as a matter of law that the act permitted a subspecies to be found only when it was recognized to exist in the "technical sense" of the word, the commissioner effectively declared himself powerless to take a hard look at available scientific information suggesting that Cook Inlet beluga whales possessed the requisite traits of a subspecies despite their lack of formal taxonomic recognition. While we must ordinarily give broad deference to an agency's discretionary decisions, "such deference is warranted only when the agency utilizes, rather than ignores, the analysis of its experts."[32] We have recognized that "outright refusal to consider the various alternatives available as a matter of discretion ... is a failure to exercise any discretion at all."[33] The commissioner's refusal here to consider any scientific information except taxonomic classification in the "technical sense" amounted to an abuse of discretion.

**31.** Indeed, we note that the commissioner's emphasis on the need for general acceptance implicitly suggests a narrow view of scientific relevance that is now generally rejected. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–89, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Coon*, 974 P.2d 386, 394 (Alaska 1999) (rejecting rule adopted in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which required general accep-

tance as condition of admissibility for scientific evidence).

**32.** *Ctr. for Biological Diversity*, 296 F.Supp.2d at 1239.

**33.** *Garner v. State*, 63 P.3d 264, 269 n. 22 (Alaska 2003) (quoting *Cano v. Municipality of Anchorage*, 627 P.2d 660, 664 (Alaska App.1981)).

We by no means suggest that the act required the commissioner to develop and explore new information on the status of Cook Inlet beluga whales. To the contrary, we reconfirm our prior decisions holding that agencies making regulatory decisions need only consider information that is submitted or is otherwise readily available.[34] But here, the available information included abundant scientific data suggesting that Cook Inlet belugas are both genetically distinctive and uniquely isolated from other beluga populations. The commissioner expressly declined to evaluate this information because he did not think that it addressed the issue of classification in the "technical sense" intended under the act. Although we express no view as to whether this information might ultimately establish the existence of a subspecies under the commonly understood meaning of the word, we hold that the commissioner erred in failing to take a hard look at this issue under the correct legal standard.

Because we have recognized that the commissioner's findings on threatened extinction provided an independent ground to deny the center's petition, our holding on the issue of subspecies status does not warrant reversal. We nevertheless recognize that the commissioner himself noted that future review of endangerment to Cook Inlet belugas may become necessary because of uncertainty surrounding the effects of the federal government's planned efforts to manage subsistence harvest. If the center believes that further review is now warranted by intervening changes, then today's holding on the issue of endangerment will not preclude it from filing a new petition. In that event, today's decision on subspecies status will require the commissioner to reevaluate his position on that issue based on a hard look at all relevant scientific information submitted or available at the time of the new review.

## IV. CONCLUSION

The decision of the superior court is AFFIRMED.

---

34. *See, e.g., Kelso v. Rybachek,* 912 P.2d 536, 539–40 (Alaska 1996).