**ALASKA RAILROAD CORPORATION, Appellant,**

v.

**NATIVE VILLAGE OF EKLUTNA and Municipality of Anchorage, Appellees.**

**No. S–11619.**

Supreme Court of Alaska.

Sept. 1, 2006.

---

William S. Cummings and Kelly McCann, Ashburn & Mason, Anchorage, for Appellant.

Sara E. Heideman, Hedland Brennan & Heideman, Anchorage, for Appellee Native Village of Eklutna.

Thomas McDermott, Assistant Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for Appellee Municipality of Anchorage.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

The Alaska Railroad wishes to remove granite rock from a quarry on culturally significant land located in the Native Village of Eklutna. In a 2004 decision, we concluded that the legislature did not clearly indicate its intention to exempt the Railroad from municipal zoning laws when it enacted the Alaska Railroad Corporation Act, and that the Railroad must apply for a conditional use permit before it may operate the Eklutna quarry. Following that decision, the Alaska Railroad Board enacted an emergency regulation allowing it to remove rock from the quarry without applying for a conditional use permit. The Railroad also asked the legislature to clarify that the Railroad is exempt from municipal zoning laws. The legislature declined to do so, instead creating a task force to study the issue. The superior court granted summary judgment to the Native Village of Eklutna, concluding that our 2004 decision required the Railroad to apply for a conditional use permit. The Railroad appeals, and we affirm.

## II. FACTS AND PROCEEDINGS

### A. *Native Village of Eklutna v. Board of Adjustment*

Our 2000 decision, *Native Village of Eklut-na v. Board of Adjustment,* forms the back-

drop of this case.[1] In that case, the Native Village of Eklutna challenged a decision by the Municipality of Anchorage to grant a conditional use permit to the National Bank of Alaska, allowing the bank to operate a granite mine on bank-owned property near Eklutna.[2] We concluded that the Municipality had ignored evidence that the mining operation would destroy one of two hills for which the village of Eklutna was named, observing that "[t]he historical value of the twin hills that gave Eklutna its name is a cultural factor that should have been considered" by the Municipality.[3] We remanded the case to the Municipality for determination of how the mining operation would impact the preservation of historic and archaeological resources, as required by the Municipality's comprehensive development plan.[4]

### B. *Alaska Railroad Corporation v. Native Village of Eklutna (Eklutna I)*

The first appeal involving the Alaska Railroad's mining operations in the Eklutna hills was *Alaska Railroad Corporation v. Native Village of Eklutna (Eklutna I)*, which we decided in 2002.[5] In *Eklutna I*, we affirmed an injunction against Damco Paving Corporation, which had procured exclusive rights to operate an Eklutna quarry owned by the Railroad.[6] The tribal government and several residents of the Native Village of Eklutna sought the injunction on the ground that the mining operation was a nonconforming use for which Damco needed a conditional use permit under Anchorage zoning laws.[7] We concluded that Damco's operation of the quarry did require a conditional use permit and affirmed entry of the injunction against Damco.[8]

### C. *Native Village of Eklutna v. Alaska Railroad Corporation (Eklutna II)*

Following the superior court's grant of an injunction against Damco in 1999, the Railroad began direct operation of the quarry.[9] Eklutna moved for a preliminary injunction. The superior court declined to issue a preliminary injunction and instead entered summary judgment for the Railroad on the ground that the Railroad was immune from local zoning ordinances.[10] The Municipality of Anchorage intervened and sought a declaration that the Railroad was subject to municipal zoning. After considering the Municipality's position, the superior court reinstated its grant of summary judgment in favor of the Railroad in 2001.[11]

On appeal, Eklutna and the Municipality argued that the Railroad was not immune from local land use regulation under state law.[12] We held that the Alaska Railroad Corporation Act[13] (ARCA) did not clearly indicate that the legislature intended to immunize the Railroad from local zoning ordinances.[14] Among other provisions, we discussed AS 42.40.390, the section at issue in the current appeal.[15] We concluded that AS 42.40.390 "should not be read as a clear

1. 995 P.2d 641 (Alaska 2000).

2. *Id.* at 641–43.

3. *Id.* at 645.

4. *Id.* (citing Anchorage Municipal Code (AMC) 21.50.020A).

5. 43 P.3d 588 (Alaska 2002).

6. *Id.* at 590.

7. *Id.*

8. *Id.* at 598.

9. *Native Vill. of Eklutna v. Alaska R.R. Corp.*, 87 P.3d 41, 44 (Alaska 2004) (*Eklutna II*).

10. *Id.*

11. *Id.*

12. *Id.* at 45.

13. AS 42.40.010 et seq.

14. *Eklutna II*, 87 P.3d at 45.

15. AS 42.40.390 provides:

The board [of the Alaska Railroad Corporation] may adopt exclusive rules governing land use by parties having interests in or permits for land owned or managed by the corporation. The power conferred by this section is exercised for the common health, safety, and welfare of the public and to the extent constitutionally permissible, may not be limited by the terms and conditions of leases, contracts, or other transactions.

declaration that the legislature intended to shield the Railroad from local land use regulation." [16] After concluding that the legislature did not clearly intend to immunize the Railroad, we adopted a "balancing of interests" test to be applied by trial courts when determining whether the Railroad is immune from municipal zoning requirements.[17] Under the balancing test, trial courts should weigh "the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests." [18] But we cautioned that trial courts should not apply the test "unless the state has made a reasonable good faith attempt to comply with local zoning laws." [19] Thus, under the rule articulated in *Eklutna II*, the Railroad should first apply for a conditional use permit from the Municipality and then seek judicial relief through application of the balancing test only if the Railroad's efforts to procure a conditional use permit prove unsatisfactory.[20]

### D. Emergency Rule 2004–E–1

On April 12, 2004, the Alaska Railroad Board adopted Emergency Rule 2004–E–1. The emergency rule authorized the Railroad to: (1) store processed materials at the Eklutna quarry; and (2) remove stored materials from the quarry. Both activities require a conditional use permit under Anchorage zoning law. In its statement of findings, the Railroad Board discussed our decision in *Eklutna II* and concluded that the decision indicated that "AS 42.40.390 in the Alaska Railroad Corporation Act gives the Railroad

Board authority to adopt 'exclusive rules' governing Railroad land and . . . if the Board adopts such rules, they would control over conflicting local regulations. . . ." Emergency Rule 2004–E–1 remained in effect for 120 days.[21]

### E. The Railroad's Request for Legislative Clarification

Following the promulgation of Emergency Rule 2004–E–1, the Railroad lobbied the Alaska Legislature to enact a bill which would have explicitly exempted the Railroad from local land use laws.[22] The proposed change was considered at hearings before the Senate Transportation Standing Committee and the House Transportation Standing Committee.

Pat Gamble, President and CEO of the Alaska Railroad Corporation, testified at a meeting of the Senate Transportation Standing Committee on April 29, 2004. Gamble described this court's decision in *Eklutna II* to the committee and indicated that the decision required the Railroad to apply for a permit:

> The Railroad, as well as any other state entity, at the present time as of the court decision on the 12th of March is not exempt from borough municipal planning and zoning. . . . The court said that there is a test that should be applied with regard to planning and zoning issues whenever the Railroad confronts a project that requires planning and zoning and that test would be to apply for a permit. If that permit comes conditionally and the conditions are not favorable to the Railroad, then the Railroad can litigate the decision and work that out in litigation on a case-by-case

---

**16.** *Eklutna II*, 87 P.3d at 47.

**17.** *Id.* at 54–55.

**18.** *Id.* (quoting *Rutgers, State Univ. v. Piluso*, 60 N.J. 142, 286 A.2d 697, 702 (1972)).

**19.** *Id.* at 55.

**20.** *Id.*

**21.** AS 42.40.190(b) provides that an emergency rule adopted by the Railroad Board remains in effect "for not more than 120 days."

**22.** The proposed legislation, contained in Senate Bill 395 and House Bill 560, would have amended AS 42.40.390 to provide:

> (b) Municipal ordinances providing for planning, platting, and land use regulation adopted under AS 29.35.180 or other law do not apply to the land of the corporation unless the land is leased to another person by the corporation and the corporation has not retained a right to use the land during the term of the lease.

basis for every individual project that it would have going in whatever municipalities and boroughs it might.

Gamble also testified at a meeting of the House Transportation Standing Committee on May 4, 2004. Again, Gamble stated that the Railroad would be required to apply for a conditional use permit: "[W]hat the court has said is if you don't have the exemption, then you must apply for a permit in every case and if you don't agree with what you get back, you must litigate...."

At the House Transportation Standing Committee meeting, Representative Ogan wondered whether exempting the Railroad from municipal zoning ordinances would allow the Railroad to "develop a rock pit in the middle of a residential neighborhood or right up against it." Gamble responded that it was "not likely the Railroad would ever try something like that." Representative Ogan also expressed concern that such an exemption would not be well-received by the public. Gamble suggested enacting a sunset clause and said, "this does not affect Eklutna, that issue is entirely separate. I mean, we are not allowed to go in and get quarry rock out of Eklutna regardless of what we decide here today or sign...."

A number of people testified in opposition to providing the Railroad a broad exemption from zoning laws, including a representative from a local land use planning organization, a representative from the Native Village of Eklutna, a representative from the Alaska Native Health Board, and a representative from the Alaska Municipal League. Ultimately the legislature deleted the proposed exemption from the bill and established a task force to "consider and make recommendation to the legislature on whether and to what extent municipal planning, platting, and land use regulations should apply to interests in land owned by the Alaska Railroad Corporation."[23] The bill forming the task force became effective June 5, 2004.[24] The task force was to file a report at the beginning of the twenty-fourth legislative session, but it apparently failed to do so.[25]

**F. The Superior Court's Grant of Summary Judgment to Eklutna**

On April 15, 2004, after the Railroad enacted its emergency rule, the Native Village of Eklutna filed a motion with this court requesting a stay of the emergency rule, or, in the alternative, a remand to the superior court so that Eklutna could challenge the enactment of the rule. Eklutna withdrew the motion for a stay after we denied the Railroad's motion for rehearing in *Eklutna II* and the matter was returned to the superior court. On May 20, 2004, Eklutna filed a motion for summary judgment in superior court, effectively seeking a ruling that the Railroad could not enact rules under AS 42.40.390 without first attempting to comply with local land use regulations. The Municipality of Anchorage intervened on behalf of Eklutna.

Superior Court Judge Mark Rindner granted Eklutna's motion for summary judgment on July 7, 2004, concluding that the superior court was bound by our determination in *Eklutna II* that AS 42.40.390 does not clearly exempt the Railroad from local regulation. Judge Rindner awarded Eklutna full attorney's fees as a public interest litigant in the amount of $19,989. The superior court entered judgment in favor of Eklutna and the Municipality on October 28, 2004. The Railroad appeals the superior court's decision. The Municipality has joined Eklutna as an appellee.

**III. DISCUSSION**

**A. Standard of Review**

 We review a grant of summary judgment de novo.[26] Questions of law are also reviewed de novo, and we adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[27] We review the superior court's determination of a litigant's public interest status for abuse of

23. Ch. 46, § 4(d), SLA 2004.

24. Ch. 46, SLA 2004.

25. Ch. 46, § 4(d), SLA 2004.

26. *Eklutna II*, 87 P.3d at 44.

27. *Id.*

discretion.[28] We will overturn an award of attorney's fees if there was an abuse of discretion or if the award is manifestly unreasonable.[29]

### B. The Public Interest Exception to the Mootness Doctrine Applies.

█ A preliminary question is whether this appeal is moot, given that the emergency rule enacted by the Railroad has expired. A disputed claim is moot "when its resolution would not result in any actual relief, even if the claiming party prevailed."[30] If a challenged law or rule is repealed or expires, a case is moot.[31] Eklutna states in its brief that this matter would be moot except that it falls under the public interest exception to the mootness doctrine.

█ We examine the following three factors to determine whether the public interest exception to the mootness doctrine applies: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[32] Here, the disputed issue is capable of repetition because the Railroad could enact another emergency rule in the future. If the Railroad chose to do so, the mootness doctrine could circumvent review because every emergency rule enacted by the Railroad must expire within 120 days by statute.[33] Therefore, if Eklutna were to challenge a future emergency rule enacted by the Railroad, the challenge would likely be rendered moot by expiration of the emer-

gency rule while litigation is pending. Finally, whether the Railroad may enact rules allowing it to circumvent local land use rules is a matter of public interest. For these reasons, we conclude that the public interest exception to the mootness doctrine applies.

The Municipality argues that this appeal will not become ripe until the Railroad applies for a conditional use permit and is denied one. That is not the issue in this case, which stems from Eklutna's challenge to the Railroad's emergency rule. The Municipality also argues that the issues in this case are beyond the scope of this court's remand because, under this court's holding in *Eklutna II*, the Railroad must apply for a conditional use permit before the court will entertain further proceedings. While it is true that this court will not hear appeals of issues beyond the scope of the remand from a prior appeal,[34] this principle does not apply to this case. Eklutna, not the Railroad, introduced this round of litigation. The important question here is not whether the Railroad has raised a new issue on remand, but whether there are *any* new issues in this appeal.

### C. Our Holding in *Eklutna II* Applies to this Case.

█ The Railroad argues on appeal that a reading of AS 42.40.390 allowing the Railroad to promulgate rules that conflict with local ordinances is not inconsistent with this court's opinion in *Eklutna II*. The Railroad focuses on the following portion of our discussion of AS 42.40.390:

> of *Fish & Game*, 938 P.2d 1019, 1023 (Alaska 1997) (holding that issue was moot because Department of Fish and Game repealed challenged regulations).

**28.** *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991) (citing *Johnson v. Tait*, 774 P.2d 185, 190 (Alaska 1989)).

**29.** *Koyukuk River Tribal Task Force on Moose Mgmt. v. Rue*, 63 P.3d 1019, 1020 (Alaska 2003) (citing *Feichtinger v. Conant*, 893 P.2d 1266, 1268 (Alaska 1995)).

**30.** *Alaska Ctr. for Env't v. Rue*, 95 P.3d 924, 929 (Alaska 2004).

**31.** *See, e.g., Burke v. Barnes*, 479 U.S. 361, 363, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987) (concluding that issue was moot because bill expired during pendency of appeal); *Krohn v. State, Dep't*

**32.** *O'Callaghan v. State*, 920 P.2d 1387, 1389 (Alaska 1996) (citing *Peloza v. Freas*, 871 P.2d 687, 688 (Alaska 1994)); *see also Alaska Ctr. for Env't*, 95 P.3d at 929. None of the public interest factors is dispositive, and whether to invoke the exception lies with the discretion of the court. *Krohn*, 938 P.2d at 1021.

**33.** *See* AS 42.40.190.

**34.** *See State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 873 (Alaska 2003).

This provision presents some evidence that the legislature intended to exempt the Railroad from local zoning laws. Its reference to "exclusive rules" might indicate that no other government's rules would apply on Railroad land. But the term "exclusive" could also be read as a choice-of-law provision—if the Railroad Board promulgated rules conflicting with local ordinances, the Railroad's regulations would govern, but in the absence of a conflict, local rules are unaffected.[35]

The Railroad also points to two footnotes—one included in this court's decision, the other in the dissent—and argues that taken together, the footnotes indicate that AS 42.40.390 must be read as allowing the Railroad, "at a minimum," to adopt land use rules that would trump conflicting local ordinances. The dissent examined a 1984 meeting of the Senate Transportation Committee at which the committee considered whether to repeal AS 42.40.390. In particular, the dissent considered a memorandum that Tamara Cook, Deputy Director of the Division of Legal Services of the Legislative Affairs Agency, wrote to the committee.[36] Cook concluded that AS 42.40.390 was either intended to grant zoning authority to the Railroad or to exclude railroad property from zoning regulations.[37] In a footnote, the dissent suggested that the court had offered a third alternative—namely, that AS 42.40.390 was a choice-of-law provision mandating that rules promulgated by the Railroad would govern in the event of a conflict.[38] The court responded in a footnote of its own, stating that "[t]he Railroad Board has not promulgated any such regulation. Contrary to the dissent's assertion ... a choice-of-law rule does not grant any immunity or authority, but only resolves conflicts between laws."[39]

Based on these footnotes, the Railroad argues that "both the majority and the dissent agreed that if the Railroad was not immune, it could, at a minimum, adopt rules that would govern over conflicting local ordinances." But the Railroad's argument neglects an important portion of our opinion in *Eklutna II*. Examining the same legislative history considered in the dissent, we analyzed some possible interpretations of AS 42.40.390.[40] We noted that various members of the Senate Transportation Committee agreed that the provision was not intended to shield the Railroad from local regulation.[41] We observed that one senator stated that the provision "was originally added to ensure that Railroad bonds would be tax exempt under a federal law," and another senator advocated retaining the provision because "the Railroad's status as a tax-exempt bonding authority was again in question."[42]

Thus, our discussion in *Eklutna II* of AS 42.40.390 considered a number of *possible* interpretations of the statute. But we did not decide which, if any, of these interpretations was correct. Regarding the possibility that the statute was intended as a choice-of-law provision, we stated only that "the term 'exclusive' *could* also be read as a choice-of-law provision" and concluded that "AS 42.40.390 is not a clear indication of legislative intent to exempt the Railroad from local zoning."[43]

The dissent's view[44] is that no plausible alternative to its interpretation of the term "exclusive rules" in AS 42.40.390 remains once we reject the theoretical interpretation of the term "exclusive" we posited in *Eklutna II*. Yet in this appeal, the Municipality has offered yet another possible interpretation of AS 42.40.390: that it was intended to grant the Railroad independent authority to convey Railroad land to third parties.[45] The Munici-

---

**35.** *Eklutna II*, 87 P.3d at 47.

**36.** *Id.* at 63 (Matthews, J., dissenting).

**37.** *Id.*

**38.** *Id.* at 63 n. 12.

**39.** 87 P.3d at 47 n. 24.

**40.** *Id.* at 47.

**41.** *Id.* at 47–48.

**42.** *Id.* at 47.

**43.** *Id.* at 47–48 (emphasis added).

**44.** Dissent at 1205.

**45.** Given that the Railroad is exempted by AS 42.40.920(11) from the rules governing state land conveyancing in the Alaska Land Act, AS 38.05,

pality's interpretation reminds us that too much attention has been focused on the term "exclusive rules" in the first sentence of AS 42.40.390 without examining the entire context of the provision.[46]

The entirety of AS 42.40.390 reads as follows:

> The board may adopt exclusive rules governing land use *by parties having interests in or permits for land owned or managed by the corporation.* The power conferred by this section is exercised for the common health, safety, and welfare of the public and to the extent constitutionally permissible, may not be limited by the terms and conditions of leases, contracts, or other transactions.

(Emphasis added.) This language expressly grants the Railroad power to authorize and regulate activities by others on its land. If this passage were concerned with the relationship between the Railroad and other government entities, then it would have stated that the Railroad may adopt exclusive rules governing its own conduct on its land, rather than exclusive rules governing land use by other parties having interests in or permits for Railroad land. And if this section were intended to confer immunity from compliance with local land use regulations, the second sentence, stating that the Railroad's power is not to be limited "by the terms and conditions of leases, contracts, or other transactions," would presumably also have mentioned local regulations, ordinances, or statutes. The lack of such language, not to mention the absence of the word "immunity" or any derivative or equivalent, lends further

weight to the inference that this passage is not concerned with the resolution of conflicts between rules adopted by the Railroad and local land use regulations. It is instead concerned with ensuring that the Railroad has the power to control activities on its land even when its wishes to deviate from those of its permittees.

The dissent argues that this interpretation—that AS 42.40.390 is concerned with regulating the relationship between the Railroad and third parties on its land—dispenses with the term "exclusive."[47] But when the term "exclusive" is read in the context of the entire provision, it appears that the provision was aimed at ensuring that the Railroad's power over its own land is exclusive in the sense that it cannot be abrogated by the "terms and conditions of leases, contracts, or other transactions" entered into with "parties having interests in or permits for land owned or managed by the corporation." Merely because the Railroad's powers over its own land are exclusive with regard to third parties, in contrast to the usual situation where contracting parties are free to bargain away their rights, does not imply that the Railroad's powers are exclusive with regard to other government entities. Far from being absurd, as suggested by the dissent,[48] government entities must commonly contend with conflicts of jurisdiction, whether it be in matters of property law, commercial law, or environmental law.[49]

 We have observed that "issues previously adjudicated can only be reconsid-

---

it makes sense to read AS 42.40.390 as conferring on the Railroad the power to enact rules governing how it will lease or convey its land to others within, of course, the constraints of other sections of the act.

**46.** The dissent takes issue with the Municipality's interpretation because the dissent interprets the term "land use" as separate from land conveyances or other forms of land transfers. Dissent at 1205. But the term "use" is capable of including conveyances and transfers of all kinds. AS 42.40.390 also uses the terms "interests" and "other transactions," both of which are general terms that can cover the full range of legal relationships including conveyances.

**47.** Dissent at 1206, 1207.

**48.** Dissent at 1206.

**49.** As the dissent points out, the problems that arise when one government entity proposes an activity that may violate the zoning rules of another government entity are common and have led to the development of traditional approaches to resolving these problems such as "the superior sovereign test," "the governmental/propriety dichotomy," or the "eminent domain test," in addition to the "balancing of interest test." Dissent at 1207. The proliferation of attempts to negotiate these conflicts of jurisdiction among governmental entities suggests that while these conflicts may be difficult to resolve, they are nevertheless common.

ered where there exist exceptional circumstances presenting a clear error constituting a manifest injustice."[50] The law of the case doctrine precludes consideration of issues that have been adjudicated in a previous appeal in the same case.[51] "Even issues not explicitly discussed in the first appellate opinion, but directly involved with or necessarily inhering in the decision will be considered the law of the case."[52] The doctrine is grounded in the principle of stare decisis. We "will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[53]

The Railroad argues that this court did not decide whether AS 42.40.390 is a choice-of-law provision in *Eklutna II* because the Railroad had not yet adopted a land use regulation. But the Railroad is asking us to reconsider arguments that we considered in *Eklutna II*. After analyzing the meaning and legislative history of AS 42.40.390 at length, we concluded that the meaning of the statute was not clear.[54] This conclusion is in keeping with our overall holding in the case: "that ARCA provides no clear indication of the legislature's intent with regard to local land use authority over the Railroad and that Alaska law does not presume state immunity to local zoning."[55] The lack of clarity in AS 42.40.390 and other ARCA provisions led us to adopt a balancing of interests test, as courts in at least fourteen other jurisdictions have done when faced with unclear statutes under similar circumstances.[56] It does not

appear that there are any changed circumstances that shed new light on the meaning of the statute as it was originally enacted. Nor are we convinced that there exist exceptional circumstances presenting a clear error constituting a manifest injustice. We decline to revisit the issue here.

The Railroad also argues that our requirement that the Railroad apply for a conditional use permit "is clearly dicta with respect to AS 42.40.390." But in fact, the requirement that the Railroad must attempt to comply with local zoning laws is a central element of the balancing of interests test that we adopted in *Eklutna II*.[57] The proper interpretation of AS 42.40.390 was adjudicated at length in *Eklutna II*. At the least, the meaning of AS 42.40.390 was "directly involved with or necessarily inhering" in this court's decision in *Eklutna II*.[58] For these reasons, we apply the law of the case doctrine to this appeal and affirm the superior court's grant of summary judgment to Eklutna.

### D. The Legislature's Response to the Railroad's Request for a Legislative Clarification Is Probative but not Dispositive.

Eklutna contends that the legislature's decision not to adopt the Railroad's proposed amendment to AS 42.40.390 is probative in this case. As we observed in *Eklutna II*, "[i]t is often an error to make much of legislative inaction."[59] But in the same opinion we considered the 1984 legislature's decision not to revise AS 42.40.390 to clarify a possible grant of immunity and observed: "[I]n

---

50. *Carlson*, 65 P.3d at 859 (internal quotations omitted).

51. *Bowers Office Prods., Inc. v. Fairbanks N. Star Borough School Dist.*, 918 P.2d 1012, 1014 (Alaska 1996).

52. *Id.* (internal citations and quotations omitted).

53. *Carlson*, 65 P.3d at 859 (internal quotations omitted).

54. *Eklutna II*, 87 P.3d at 48.

55. *Id.* at 45.

56. *Id.* at 54.

57. *See Eklutna II*, 87 P.3d at 55 ("Resort to the balancing of interests test is limited by two threshold requirements. First, because the test aims to discern legislative intent, direct statutory grants of immunity control when they exist. Second, the court will not resolve conflicts under the balancing test unless the state has made a reasonable good faith attempt to comply with local zoning laws.") (internal citations omitted).

58. *See Bowers Office Prods.*, 918 P.2d at 1014 (discussing law of the case doctrine) (internal quotations omitted).

59. *Eklutna II*, 87 P.3d at 48 (citing *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 749, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

this context, with the problem and solution plainly before it, we see the legislature's decision as at least suggesting that AS 42.40.390 was not intended as a shield against local regulation." [60] The 2004 legislature was in a similar position—that is, it had specific proposed legislation to add to AS 42.40.390 which would have clarified that the Railroad is exempt from local zoning. The legislature chose not to amend the statute, but instead formed a task force.

When it decided not to adopt the Railroad's proposed amendment, the 2004 legislature was well aware of this court's decision in *Eklutna II,* as reflected in the minutes of the transportation committee hearings in both chambers. And, as noted above, Gamble told the House Transportation Committee that the Railroad would not be allowed to get quarry rock from Eklutna regardless of the legislature's decision. In fact, when Gamble made this statement, the Railroad had already adopted Emergency Rule 2004–E–I. There is no indication in the committee minutes that the legislators were aware of the emergency rule. At one point in the House Standing Transportation Committee hearing, Representative Kookesh questioned Gamble's characterization of the status quo as being that the Railroad is exempt from local zoning laws and observed that "the status quo is what the Supreme Court said it was." Although Gamble engaged in a discussion with Kookesh about the proper definition of the status quo, he did not mention that the Railroad had promulgated an emergency rule that would allow it to remove rock from the quarry. Given this sequence of events, and the legislators' apparent understanding that the Railroad was required to apply for a conditional use permit under this court's decision in *Eklutna II,* we believe that the legislature's decision not to clarify the meaning of AS 42.40.390 is probative in this case. We note, however, that we do not consider a legislative decision of this nature to be dispositive standing on its own.

### E. The Superior Court Did Not Err in Awarding Full Attorney's Fees to Eklutna Under the Public Interest Litigant Doctrine.

 The Railroad argues that the superior court erred in granting full attorney's fees to Eklutna under the public interest litigant doctrine. The Railroad argues: (1) that AS 09.60.010(b) prevents Eklutna from claiming public interest litigant status; and (2) that Eklutna does not qualify as a public interest litigant. We conclude that the superior court did not abuse its discretion when it determined that Eklutna was a public interest litigant.

#### 1. Alaska Statute 09.60.010(b) does not apply to this case.

The Railroad first argues that AS 09.60.010(b) prevents Eklutna from claiming public interest litigant status. Alaska Statute 09.60.010 was amended in 2003 to state:

> Except as otherwise provided by statute, a court in this state may not discriminate in the award of attorney fees and costs to or against a party in a civil action or appeal based on the nature of the policy or interest advocated by the party, the number of persons affected by the outcome of the case, whether a governmental entity could be expected to bring or participate in the case, the extent of the party's economic incentive to bring the case, or any combination of these factors.[61]

Eklutna does not disagree that this provision repeals the public interest litigant doctrine, but argues that the amendment does not apply to Eklutna because this suit was filed before the amendment came into effect. Alternatively, Eklutna argues that the amendment is unconstitutional.

As both parties acknowledge, AS 09.60.010(b) applies only to suits filed on or after September 11, 2003.[62] Eklutna contends that the provision does not apply to this action because the action is part of Eklutna's original suit for an injunction against the Railroad, which Eklutna filed in 2001. The Railroad argues that Eklutna's challenge

---

**60.** *Id.*

**61.** AS 09.60.010(b); ch. 86, SLA 2003.

**62.** *See* ch. 86, § 4, SLA 2003.

to Emergency Rule 2004–E–1 is a new case and that Eklutna should have either filed a new action or amended its original complaint to protest the emergency rule, rather than filing a post-appeal motion for summary judgment.[63] Judge Rindner agreed with Eklutna and concluded that the case was *filed* before September 11, 2003, as required by the language of the session law.[64]

Eklutna's position is that this case has been an equitable action from the beginning because Eklutna sought an injunction, and once equitable jurisdiction attaches, the court retains continuing jurisdiction until the dispute is resolved. This is the general rule.[65] The Railroad argues that Eklutna should have either filed a new action or amended its complaint after the Railroad enacted Emergency Rule 2004–E–1, but the Railroad does not explain why amending the 2001 complaint to add a new cause of action would be the equivalent of filing a new case after the September 11, 2003 deadline. Under Alaska law, a statute of limitations does not bar a party from amending the original complaint so long as the amendment relates back to the original claim, filed before the limitations period has run.[66] Although this case does not involve a statute of limitations, the "relating back" test—that is, "whether the new claim involves the same transaction or occurrence alleged in the original complaint"[67]—is useful by analogy. Even if Eklutna had amended its complaint, as the Railroad suggests it should have, the amended complaint would have been sufficiently related to the original complaint that it could be considered part of the same lawsuit. We also note that Eklutna moved for summary judgment in an effort to enforce this court's decision in *Eklutna II* during the remand; this circum-

stance reinforces our conclusion that this appeal stems from Eklutna's original lawsuit that was filed before September 11, 2003. Having determined that AS 09.60.010(b) does not bar Eklutna's claim of public interest litigant status, we need not consider whether its enactment violated the Alaska Constitution.

**2. The superior court did not abuse its discretion when it determined that Eklutna is a public interest litigant.**

The Railroad next argues that Eklutna does not qualify as a public interest litigant. This court examines four factors to determine whether a party qualifies for the public interest litigant exception to Civil Rule 82. The factors are: (1) whether the case is designed to effectuate strong public policies; (2) whether the plaintiff's success will cause numerous people to benefit from the lawsuit; (3) whether only a private party could have been expected to bring the suit; and (4) whether the purported public interest litigant would have sufficient economic incentive to file suit even if the action "involved only narrow issues lacking general importance."[68] The Railroad argues that Eklutna cannot satisfy the third factor because the Municipality is a party to the action.

The superior court disagreed, noting that Eklutna had been treated as a public interest litigant in related cases. Eklutna quotes from *Spenard Action Committee v. Lot 3, Block 1, Evergreen Subdivision* to support its contention that under the public interest litigant doctrine, "where a municipality has the power and ability to bring an action but declines to do so, the situation is one where 'for all practical purposes, only a private

---

**63.** Although the Railroad did not challenge the procedural posture of the case when Eklutna filed its motion for summary judgment, the Railroad did preserve the right to make this argument in a stipulation with Eklutna.

**64.** *See* ch. 86, § 4, SLA 2003.

**65.** *See* 18 Am.Jur.2d *Contribution* § 74 (2004) ("Once a court of equity acquires jurisdiction of the subject matter, it will retain it until full justice has been done between the parties."); *see also Foster v. State,* 752 P.2d 459, 465 (Alaska

1988) (stating that "once a court obtains jurisdiction for equitable purposes, it may dispose of all issues before it, whether equitable or legal").

**66.** *See, e.g., Brown v. Ely,* 14 P.3d 257, 263 (Alaska 2000) (construing Civil Rule 15(c)).

**67.** *Id.*

**68.** *Citizens Coalition for Tort Reform, Inc. v. McAlpine,* 810 P.2d 162, 171 (Alaska 1991) (citing *Anchorage Daily News v. Anchorage Sch. Dist.,* 803 P.2d 402, 404 (Alaska 1990)).

party could have been expected to bring [suit].' " [69] In *Spenard Action Committee,* we examined whether a citizens' group that sought to abate prostitution was a public interest litigant.[70] We concluded that the group was a public interest litigant even though the Municipality of Anchorage could have enforced the anti-prostitution laws because the Municipality refused to do so.[71] In this case, Eklutna asserts that it requested the Municipality to take action in 2001 to prevent the Railroad from mining the quarry. The Municipality refused to do so, forcing Eklutna to seek an injunction. Eklutna also requested the Municipality's assistance in April 2004, after the Railroad enacted Emergency Rule 2004–E–1. Again, the Municipality refused to take action, and Eklutna filed its own summary judgment motion. The Municipality did not intervene until later. Eklutna's attorney, Sara Heideman, sets forth these facts in an affidavit and they are not disputed in the record before us.

The Railroad argues that this case differs from *Spenard Action Committee* because in this case the Municipality has intervened on behalf of Eklutna. The Railroad concedes that "the Municipality participated in this litigation but allowed [Eklutna] to carry the burden of the briefing," yet argues that the Municipality, not the Railroad, should bear the costs of this decision.[72] Denying Eklutna public interest litigant status merely because the Municipality joined the suit later would defeat the purpose of the public interest litigant doctrine, which is "designed to encourage plaintiffs to bring issues of public interest to the courts." [73] We conclude that the

superior court did not abuse its discretion when it awarded Eklutna full reasonable attorney's fees under the public interest litigant doctrine.[74]

## IV. CONCLUSION

Because *Eklutna II* requires the Railroad to apply for a conditional use permit before operating the Eklutna quarry, we AFFIRM the superior court's decision in its entirety.

MATTHEWS, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

MATTHEWS, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

In my view AS 42.40.390 [1] is a direct legislative grant to the Railroad of immunity from local zoning. The power to adopt "exclusive rules governing land use" for railroad land necessarily means that local governments that might otherwise be able to regulate railroad lands are excluded.[2] Today the court disavows the only alternative to this view that it offered in its prior opinion. The alternative interpretation was that "the term 'exclusive' could also be read as a choice-of-law provision—if the Railroad Board promulgated rules conflicting with local ordinances, the Railroad's regulations would govern, but in the absence of a conflict, local rules are unaffected." [3]

I think that the court at this point should recognize that it has retracted, and thus changed, an important part of its prior opinion. The court's retraction means that it was

---

69. 902 P.2d 766, 782 (Alaska 1995).

70. *Id.*

71. *Id.*

72. The Railroad does not contend that the fees charged were unreasonable.

73. *Anchorage v. McCabe,* 568 P.2d 986, 990 (Alaska 1977).

74. The Municipality argues that the Railroad should pay its full attorney's fees because the Railroad's case is without merit. The Municipality provides little support for this argument.

1. AS 42.40.390 provides:

> The board may adopt exclusive rules governing land use by parties having interests in or permits for land owned or managed by the corporation. The power conferred by this section is exercised for the common health, safety, and welfare of the public and to the extent constitutionally permissible, may not be limited by the terms and conditions of leases, contracts, or other transactions.

2. This position was explained in more detail, and supported by legislative history, in the dissenting opinion in *Native Village of Eklutna v. Alaska Railroad Corp. (Eklutna II),* 87 P.3d 41, 62–65 (Alaska 2004) (Matthews, J., joined by Bryner, J., dissenting).

3. *Id.* at 47.

originally mistaken in thinking that the grant of exclusive rule-making authority to the Railroad left some room for local regulation of railroad lands. The court should now construe section .390 in accordance with its plain language as confirmed by clear legislative history and hold that section .390 excludes railroad land from municipal zoning.

Is there something else that the "exclusive rules" provision of section .390 could mean? Today's opinion offers two new alternatives. But, as I discuss in the following section, neither is plausible.

### I.

As the first new alternative, the court states that an interpretation offered by the Municipality is "another possible interpretation."[4] The Municipality's interpretation is that section .390 governs *conveyances* of railroad lands. But the explicit subject of section .390 is "exclusive rules" governing railroad land *use*, not transfers of interests in railroad lands. The important subject of transfers of interest in railroad lands is governed by other sections of the act, primarily AS 42.40.285(1) and (4) and AS 42.40.350(c) and (d).[5] Since land conveyances and land use are separate subjects treated in separate statutory sections, the view that section .390 governs conveyances, when it states that it governs land use, seems frivolous.

**4.** Op. at 1199–1200.

**5.** These statutes provide:

AS 42.40.285(1) and (4):
Unless the legislature approves the action by law, the corporation may not
(1) exchange, donate, sell, or otherwise convey its entire interest in land;
...
(4) lease land for a period in excess of 55 years unless the corporation reserves the right to terminate the lease if the land is needed for railroad purposes[.]
AS 42.40.350(c) and (d):
(c) The corporation may lease, subject to AS 42.40.285 and (d) of this section, grant easements in or permits for, or otherwise authorize use of portions of rail land. However, the corporation may not convey its entire interest in rail land except as provided in AS 42.40.285, 42.40.370(d) and 42.40.400.
(d) A lease or disposal of land approved by the legislature under AS 42.40.285 by the corporation to a party other than the state shall be

The second new alternative interpretation offered by the court is that the land use rules authorized by section .390 are to ensure "that the Railroad has the power to control activities on its land even when its wishes to deviate from those of its permittees," but that these land use rules are subject to local land use regulations.[6] It is of course true that one purpose of section .390 is to ensure that the Railroad can control the land use activities of its lessees and permittees. The power thus granted is a regulatory power granted to the Railroad as a government entity. It is to be exercised, like zoning, "for the common health, safety, and welfare of the public," (as the second sentence of AS 42.40.390 makes clear) rather than as a landlord's power to specify in leases and permits how land should be used. However, the second part of the court's interpretation, that the land use regulatory power granted to the Railroad by section .390 is subject to the land use regulatory power of any municipality which encompasses railroad lands, is not a reasonably possible interpretation for three reasons.

First, the interpretation reads the word "exclusive" out of section .390. Since the Railroad's power to regulate its land is "exclusive," it follows that a municipality may not also regulate them.[7]

made at fair market value as determined by a qualified appraiser or by competitive bid.

**6.** Op. at 1200–01.

**7.** In response to this point the court states that "exclusive" as used in the statute merely means that lessees and permittees do not also have regulatory power to adopt land use rules. Op. at 1200–01. But we know both as a matter of logic and from the legislative history of section .390 that this is not what the legislature had in mind. Lessees and permittees do not have governmental land use regulatory authority. Therefore there is no need to exclude them from its exercise. When the legislature grants zoning power to municipalities it does not find it necessary to state that the power is exclusive of powers that might otherwise be exercised by municipal lessees, because lessees lack zoning power. And we know from the legislative history that section .390 was intended to grant the Railroad the land use regulatory authority of a government. *See* the discussion of legislative history of section .390 *infra* at pages 1206–08.

Second, the interpretation requires us to believe that the legislature intended that two separate governmental entities—a municipality and the Railroad—would both have the authority to zone railroad land. Imposing a system in which two government entities have the authority to zone the same land would be so irrational as to be absurd, especially when there is no built-in mechanism for resolving conflicts between the zoning entities.[8] The interpretation thus conflicts with the rule of construction that statutes should not be interpreted to reach absurd results.[9]

Finally, this interpretation is not only textually untenable and absurd in result, it also conflicts with the legislative history. That history was examined in detail in the dissenting opinion in *Eklutna II*.[10] To summarize it briefly, section .390 was originally drafted in a legislative session in which the Alaska Railroad Corporation Act was considered but not passed. In 1984, when the act was passed, the Chairman of the Senate Transportation Committee was initially uncertain as to what the section meant. As today's opinion states, a legislative attorney advised the committee that section .390 "was either intended to grant zoning authority to the Railroad or to exclude railroad property from zoning regulations."[11] During subsequent meetings concerning section .390 this interpretation was never questioned, although the desirability of retaining section .390 was. In the end, however, section .390 was approved when, on the final day of committee deliberations Senator Halford argued that it was needed to "protect the railroad's operations from local zoning restrictions."[12] Senator Gilman, who argued for the deletion of section .390, said that it originally was put in "to establish some rationale for why the railroad should get a tax-exempt bonding authority" and opined that this was no longer necessary.[13] But Senator Faiks argued that tax exemption was still a problem. Hers was the last word and section .390 was retained. As the dissent in *Eklutna II* states:

> In order to have tax-exempt bonding status, it was believed that the Railroad needed land use regulation powers comparable to those of a local government. Such powers were granted. It does not matter whether the powers were granted primarily so that the Railroad could issue tax-free bonds or so that the Railroad would not be disturbed in its operations by municipal zoning. Whatever the dominant motive may have been, the grant of exclusive land use regulatory power was the same.[14]

The most valuable and least controversial use of legislative history is to show the problem, or the problems, that the legislature was addressing. When the problem is known, the effect of language that might otherwise be obscure often becomes apparent.[15] Here

---

**8.** In response to this point the court states that "government entities must commonly contend with conflicts of jurisdiction." Op. at 1200–01. This generality is correct, but it does not detract from the point that it would be absurd to give two separate government entities the authority to zone the same land. The court offers neither a rationale for, nor an example of, a statute that bestows conflicting zoning authority.

**9.** *Sherman v. Holiday Constr. Co.*, 435 P.2d 16, 19 (Alaska 1967) (it is a judicial duty "to construe statutes so as to avoid results glaringly absurd").

**10.** 87 P.3d at 62–65 (Matthews, J., joined by Bryner, J., dissenting).

**11.** Op. at 1199.

**12.** *Eklutna II*, 87 P.3d at 63–64 (dissenting opinion).

**13.** *Id.* at 64.

**14.** *Id.*

**15.** *See, e.g.*, 2A Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION § 4502, at 15 (6th ed. 2000) ("Before the true meaning of a statute can be determined where there is genuine uncertainty concerning its application, consideration must be given to the problem in society to which the legislature addressed itself."); Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes*, 65 S. CAL. L.REV. 845, 848–49 (1992) (noting that "legislative history helps a court understand the context and purpose of a statute" which can "clarify ambiguity" and can help to "avoid[ ] absurd results"); *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 S.Ct. 1453, 1459, 161 L.Ed.2d 316 (2005) (concurring opinion of Breyer, J., joined by three other justices) (advocating examination of "context, not just literal text" as a guide "to Congress intent") (discussed in *ICHRRA v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1010 n. 5 (Alaska 2006) (Matthews, J., concurring)).

the history of section .390 shows that it was meant to address two, and only two, problems. One was the need to ensure that the Railroad would be recognized as a tax-exempt entity entitled to issue tax-free bonds. The other was the need to protect the Railroad in its operations from impediments imposed by local zoning. Section .390 was the solution to both problems. In order to establish the bona fides of the Railroad as a government entity entitled to tax-exempt treatment, the Railroad was granted exclusive land use regulatory power. In order to protect the Railroad from operational interference from local zoning, the Railroad was granted the same exclusive power. The legislative history thus unmistakably shows that section .390 was meant as a grant to the Railroad of exclusive land use regulatory power. There is, quite simply, no history suggesting that concurrent land use authority was intended by the legislature, much less concurrent authority that would give precedence to municipal zoning in case of a conflict.

This new concurrent authority with municipal zoning given precedence interpretation is the reverse of the now-rejected alternative interpretation offered by the court in *Eklutna II.* That alternative also posited concurrent zoning authority for municipalities and the Railroad. If particular railroad land was covered by municipal zoning and the Railroad had not passed land use regulations governing that land, it would be controlled by the municipal zoning regulations. But upon passage by the Railroad of land use regulations governing the land, the railroad regulations would take precedence. The now-rejected interpretation, in other words, read "exclusive" to state a rule of priority rather than a rule of exclusion. That is an unusual interpretation of "exclusive," but at least the

word was not completely ignored. Currently, however, the court appears to be saying that a municipality and the Railroad both have concurrent zoning authority and in cases where both have acted and there is a conflict the municipal regulations, rather than the railroad regulations, prevail. The word "exclusive" has gone missing.

## II.

I also think that the court has made a fundamental mistake as to the nature of the "balancing of interests" test. That test, which was first announced by the Supreme Court of New Jersey in *Rutgers, State University v. Piluso,*[16] rejects traditional approaches to the problem that arises when one government entity proposes an activity that may violate the zoning rules of another government entity. The traditional approaches inferred immunity from zoning based on (1) the status of the competing entities (the superior sovereign test), (2) the nature of the proposed activity (the governmental/proprietary dichotomy), or (3) the fact that the proposed activity was or was not supported by the power to condemn property (the eminent domain test). The *Rutgers* balancing of interests test rejects the rote or "ritualistic" practice of inferring immunity based on the presence or absence of the above factors.[17] Instead, the question of immunity is to be answered by considering many factors, including those on which the traditional approaches are based, that may be relevant to the particular question of which governmental entity should prevail. The balancing of interests test thus rejects the practice of inferring legislative intent from just one factor, in favor of inferring legislative intent from a number of factors that are thought to be relevant to a resolution of particular land use conflicts between government entities.[18]

16. 60 N.J. 142, 286 A.2d 697 (1972).

17. *Id.* at 701.

18. *Id.* at 702. Because immunity, or the lack thereof, is inferred from a number of factors that may be relevant to the ultimate policy decision as to the location of a particular project, it is easy to see why the balancing test is preferred by many authorities to the traditional approaches that focus on factors that may be irrelevant to a rational

policy choice. The drawback of the balancing test is that ultimately the policy choice is made by courts, rather than by executive or legislative authorities. Issues involving balancing local interests with state-wide needs are not readily amenable to judicial analysis. This drawback can be avoided where the balancing decision maker is an agency that is legally competent to make complicated policy choices. The American Law Institute's Model Land Development Code creates regional agencies to make such decisions,

The underlying premise of the balancing of interests test (and the traditional approaches) is that the state legislature has not actually addressed the subject of whether the entity proposing the activity should or should not be subject to local zoning. The inquiry is in essence "what the legislature would have done had it considered the question." [19] The test entails a search for hypothetical legislative intent by using factors relevant to local and broader needs "[w]hen the state legislature is silent on the subject" because "it wasn't thinking about the problem." [20]

Since there can be no doubt that the legislature was thinking about the problem of whether the Railroad should be immune from local zoning when it considered section .390,[21] the premise of the balancing of interests test is not satisfied here. As a result, the court's duty is to determine what the legislature meant when it enacted the "exclusive rules" provision. The balancing of interests test is a rule that rejects rote inferences of immunity drawn from collateral legislation, but it is not a rule that changes a court's fundamental duty to interpret statutes that directly address the subject of immunity. Balancing of interests applies in the absence of a directly relevant statute, but it is not a rule intended to resolve ambiguities in statutes that address the subject of immunity.[22]

The Supreme Court of New Jersey designed the *Rutgers* balancing test to prohibit courts from using legal relationships that do not directly concern land use control to draw inferences about one government entity's amenability to zoning by another. Today's opinion has converted the *Rutgers* balancing test into a rule of statutory construction precluding the immunization of one entity from the zoning power of another unless the land use control law states the immunization objective with a high standard of clarity.[23] This conversion of the *Rutgers* balancing test into a clear-statement rule reflects a presumption in favor of local zoning power over state land use. Judicially created clear-statement rules are based on a presumption that a particular result is disfavored, thus requiring laws to make a clear statement

---

and a state-wide board to hear appeals from regional agencies. *See* MODEL LAND DEV.CODE §§ 7-304-504 (1975). The general Alaska statutory system also avoids setting up the courts as the ultimate policy decision maker in inter-governmental zoning disputes, without the bureaucratic overlay of the Model Code. Under AS 35.30.020 and .030 state agencies are required to comply with local zoning subject to a waiver in cases of overriding state interest. The governor makes the decision as to whether an overriding state interest exists. But this sensible system does not apply to the Railroad because a provision of the Alaska Railroad Corporation Act states that AS 35 does not apply to the Railroad. AS 42.40.920(b)(3). It is one of the ironies of this case that the legislative efforts to make the Railroad *less* subject to local zoning control than other state agencies—the status quo for the Railroad as a former federal entity was that it was not subject to local zoning—has resulted in the Railroad becoming *more* subject to local control; or, at least, that it must endure a less certain (and more expensive and time-consuming) method of obtaining an overriding state interest waiver than other agencies.

**19.** *City of Crown Point v. Lake County*, 510 N.E.2d 684, 689 (Ind.1987).

**20.** *City of Temple Terrace v. Hillsborough Ass'n for Retarded Citizens*, 322 So.2d 571, 578–79 (Fla. App.1975).

**21.** *See supra* pages 1206–08.

**22.** *E.g.*, *City of Rapid City v. Pennington County*, 669 N.W.2d 120 (S.D.2003). This case involved a dispute between a county that proposed to locate a jail-work release facility in a city in violation of the city's zoning and comprehensive plan. The governing statute provided that no public building "shall be constructed" without city planning commission approval, but another section provided that planning commission "disapproval may be overruled by" the board authorizing the building. *Id.* at 122 (discussing SDCL 11–6–19 and 11–6–21). Over a dissent that argued that South Dakota's previously adopted balancing test should apply, the court construed the statute to mean that the county was not subject to the city's zoning ordinance with respect to the creation of the jail-work release facility. *Id.* at 124–26.

**23.** This is evident from the introductory language of today's opinion where the court, in explaining *Eklutna II*, states that because "the legislature did not *clearly* indicate its intention to exempt the Railroad from municipal zoning laws when it enacted the Alaska Railroad Corporation Act ... the Railroad must apply for a conditional use permit" under the zoning code of the Municipali-

that such a result is intended.[24] That the *Rutgers* balancing test cannot be interpreted to be a clear-statement rule is clear from the *Rutgers* opinion. Far from reflecting a presumption disfavoring state land uses when they conflict with local zoning, the New Jersey court stated in *Rutgers* that state functions and agencies would generally *not* be subject to restriction or control by local land use regulations.[25] The *Rutgers* court stated:

> With regard to a state university ... there can be little doubt that, as an instrumentality of the state performing an essential governmental function for the benefit of all the people of the state, the Legislature would not intend that its growth and development should be subject to restriction or control by local land use regulation. *Indeed, such will generally be true in the case of all state functions and agencies.*[26]

Rather than use a rule of statutory construction that gives courts permission to ignore relevant statutes that speak to the question of the allocation of the power to control land use unless the courts find them to be "clear"—a rule that is not part of the *Rutgers* balancing test—the court should, in my opinion, use customary rules of statutory interpretation in order to determine what the legislature actually meant when it addressed the subject of the Railroad's authority to adopt exclusive rules governing railroad land use.

To sum up, I think that the court erred in *Eklutna II* when it declined to interpret section .390 to exempt railroad land from local zoning. Such an interpretation is required by our customary touchstones of statutory interpretation, the language of the section as confirmed by its unusually clear legislative history.[27] The court has now found it necessary to recant the only alternative interpretation of section .390 that it offered in *Eklutna II*. I think this should signal to the court that it made a mistake in *Eklutna II* and that the mistake should now be corrected. Instead, the court has offered two new alternative interpretations. These new interpretations stray so far afield from our traditional methods of statutory interpretation as to be completely implausible, in my opinion. The court is able to justify its failure to reach a conclusive interpretation of the meaning of section .390 by creating a clear-statement rule of statutory construction. This rule allows the court to brush aside any statute that addresses the land use rule-making authority of entities other than municipal zoning boards unless the statute clearly exempts the other entities from municipal zoning. This is a distortion of the *Rutgers* balancing test. Our established rules of statutory interpretation do

ty of Anchorage. Op. at 1194–95 (emphasis added).

24. *See Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 790, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (Blackmun, J., dissenting) (noting, in disapproval, that so-called clear-statement rules "are designed as hurdles" against disfavored results) (internal quotations omitted); Dan M. Kahan, *Is Chevron Relevant to Federal Criminal Law?*, 110 HARV. L. REV 469, 504 (1996) (reporting that in the face of a clear-statement rule, "only express [legislative] action will suffice to establish the disfavored reading").

25. *Rutgers*, 286 A.2d at 703.

26. *Id.* (emphasis added).

27. *See*, concerning our customary methods of statutory interpretation, *Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1043–44 (Alaska 1992):
> Generally, the most reliable guide to the meaning of a statute is the words of the statute construed in accordance with their common usage. *Lagos v. City & Borough of Sitka*, 823 P.2d 641, 643 (Alaska 1991). However, even where the statutory language considered alone seems to leave room reasonably for only one meaning, we nonetheless may consult legislative history and the rules of statutory construction, realizing that sometimes language that seems clear in the abstract takes on a different meaning when viewed in context. *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 (Alaska 1978); *State v. Alex*, 646 P.2d 203, 208 n. 4 (Alaska 1982). In such cases the legislative history and rules of construction must present a compelling case that the literal meaning of the language of the statute is not what the legislature intended. *University of Alaska v. Geistauts*, 666 P.2d 424, 428 n. 5 (Alaska 1983) ("Where a statute's meaning appears clear and unambiguous, ... the party asserting a different meaning has a correspondingly heavy burden of demonstrating contrary legislative intent."); *State v. Alex*, 646 P.2d at 208 n. 4 (under Alaska's sliding-scale approach to statutory interpretation, the more plain the language of the statute the more convincing the evidence of contrary legislative intent must be).

not require statutory clarity—where clarity exists there is little need for the rules. In my view, when a normal approach is taken to the question of the meaning of section .390 only one interpretation is reasonably possible.

For these reasons, I dissent.